Rogers v. Saunders.

ZEBEDIAH ROGERS, *in Eq. vs.* JAMES SAUNDERS, JR.

It is a matter of discretion in the Court, whether or not to decree a specific performance, not dependent however upon the arbitrary pleasure of the Court, but regulated by general rules and principles.

When a contract is in writing, is certain, fair in all its parts, is for an adequate consideration, and is capable of being performed, it is a matter of course for a court of equity to decree performance.

And performance may in a proper case be decreed, where the party has lost his remedy at law.

But laches and negligence in the performance of contracts are not thereby to be countenanced or encouraged; and the party seeking performance must show, that he has not been in fault, but has taken all proper steps towards performance on his own part, and has been ready, desirous and prompt to perform.

A written agreement concerning lands may be enforced in equity, although binding only on the party to be charged.

Where the binding efficacy of a contract has been lost at law by lapse of time, a court of equity will grant relief, when time is not of the essence of the contract.

But where the party who applies for a specific performance, has omitted to execute his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification or excuse for his delay, and where there is nothing in the acts or conduct of the other party, that amounts to an acquiescence in that delay, the Court will not compel a specific performance.

Nor will they do it where the remedies are not mutual, and where the party who is not bound, lies by to see whether it will be a gainful or a losing bargain, to abandon it in the one event, and in the other to consider lapse of time as nothing, and claim a specific performance.

If the contract be in relation to wild and uncultivated lands, where the principal value is timber, time may be of the essence of the contract.

THIS case was heard on bill, answer and proof. The claim of the plaintiff for relief, and the defence set up in the answer, as well as the proof in the case, will be sufficiently understood in the opinions given by the majority and minority of the Court, without repeating the same here. The following is a copy of the contract referred to. "*Oleman, July* 11, 1832. I agree to give *Z. Rogers* a bond for a deed of ½ of 6 lots of land, being the same that I and *J. O. Rogers* bo't of the State in *Dec.* 1830, the consideration of said bond when said *Rogers* pay, cause to be pay to the

State their claim, and then 1 agree to deed to order, and I further agree to give up all claim for stumpage cut on said land by other people. *James Saunders, Jr.*"

The case was argued at the adjourned term in *August*, 1836, before the CHIEF JUSTICE and EMERY J., PARRIS J. having resigned, and no successor having been then appointed, by *Rogers*, for the plaintiff, and by *F. Allen*, for the defendant. The Judges disagreed, and no opinion was given. It was again argued at the *June Term*, 1838, by *Rogers* and *J. Appleton*, for the plaintiff, and by *F. Allen*, for the defendant, before the whole Court, and the opinions of the Court were delivered at the *July Term*, 1839.

*For the plaintiff*, it was argued, that although the contract was an agreement to give a bond of the land, it was an ordinary case of equitable jurisdiction, where specific performance is decreed. *Story's Eq. sec.* 722, 729; 1 *Sim. & St.* 66; 16 *Ves.* 416; 3 *Ves.* 59. The defendant resists performance by setting up in his answer a condition at variance with the contract. There is no proof of this, and the answer is not evidence, because it is not responsive to the bill. 4 *Paige*, 33; 2 *Stuart*, 280; 3 *Mason*, 383. And because it sets up a condition not in the contract. 8 *Pick.* 119; 2 *McCord's Ch. R.* 156; 1 *Gill & John.* 272; 1 *Har. & Gill*, 13; 1 *Munf.* 373. When the answer admits certain facts, and relies on other facts by way of avoidance, such facts must be proved. 2 *Johns. Ch. R.* 62; *Flagg* v. *Mann*, 2 *Sumner*, 486. The respondent alleges in his answer, that he is not bound by his contract, because it was not mutual. Under the statute of frauds, even at law, mutuality is not necessary. *Sug. Vend. & Pur.* 43; 2 *Story's Eq.* 715, 751; 1 *Munf.* 48; 3 *Dess.* 514. Equity will compel one to perform his contract, although the other party is not bound. 2 *Dess.* 271; 1 *McCord's Ch. R.* 39; 1 *Edw.* 1; 1 *Sim. & St.* 63; 1 *Russ.* 391·; 4 *Munf.* 177; 2 *Jac. & W.* 425; 14 *Johns. R.* 485; 4 *Greenl.* 360. But here acts of possession and part performance are joined with the contract, and that is always sufficient. 6 *Har. & John.* 288; 14 *Johns. R.* 15; 4 *Har. & McH.* 252. It is objected in the answer, that specific performance of the contract is barred by lapse of time. But time here was not of the essence of the contract, and therefore no bar. The delay was no injury to the defendant. 2 *Ball*

& B. 228; 12 *Ves.* 326; 4 *Greenl.* 360; 2 *Brockenb.* 185; 2 *Har.* & *J.* 46. But here the plaintiff has been in possession, exercising acts of ownership, and paying taxes on the land. In such case, lapse of time is no bar to a specific performance. 4 *J. J. Marshall,* 157; 4 *Munf.* 332; 14 *Johns. R.* 15; 2 *Hovenden on Fr.* 20.

*For the defendant,* it was argued, that the paper called a contract is so loose and uncertain, that no specific performance of it can be decreed. The Court will not undertake to conjecture the intention of the parties, and exercise its own discretion in making a bargain for them. 6 *Johns. Ch. R.* 222. It is without consideration, and therefore no decree can be founded upon it. It is said that it is not necessary to state any in the bill or declaration, where the statute of frauds interposes. If so, it does not dispense with proof of it, and none is here given. The want of mutuality is decisive against the plaintiff's claim. *Powell on Con.* 221; *Newland on Con.* 152. The plaintiff must have performed on his part, before he can call on the other party to perform. It is said in the bill, that he arranged with the land agent of *Massachusetts* for delay. This is denied in the answer, and there is not the slightest proof of it. It was never done, but if it had been, it would have been wholly unavailing, because it is not pretended, that it was done with our assent. And further, we specially notified him to perform, and he neglected. As no time was fixed in the paper, it should be done within a reasonable time. The law will not permit a party to lie by, and permit him to have advantage of the rise of property, and at the same time be under no obligation to take it, should it fall in price. 6 *Wheat.* 524; 4 *Dallas,* 345. Time is the essence of the contract in all such cases, and indeed in all cases whatever, where but one party is bound. He must show strict compliance on his part, or he cannot call on the other party to perform. 9 *Cranch,* 456; 2 *Wheat.* 336; 1 *Peters' Cir. C. Rep.* 380; *Sug. on Vend.* & *P.* 246; *Powell on Con.* 235; *Newland on Con.* 242; 5 *Cranch,* 278; 3 *Mass. R.* 12; 10 *Wheat.* 152; 6 *Cranch,* 51; *Fonb. Eq.* 48, 482. A court of equity will not interfere where there is a perfect remedy at law, as there is here, if the defendant has failed to perform any contract. 16 *Pick.* 357; 4 *Peters,* 428.

The opinion of a majority of the Court was drawn up, and de-livered by SHEPLEY J.

A dissenting opinion was delivered by EMERY J.

SHEPLEY J.—— It appears from the bill and answer to be admit-ted, that on the seventeenth day of *December*, 1830, the defend-ant and *J. O. Rogers* purchased of the State, six lots of land in township number two in the old Indian purchase, the defendant taking the whole title and giving his notes payable in one, two, three, and four years with interest annually, and securing the pay-ment of them by sureties and by a mortgage of the premises. These notes remaining unpaid on the eleventh of *July* 1832, the defendant agreed to sell his half of these lots to the plaintiff accord-ing to the terms of the contract now sought to be enforced. It is important in the first place to ascertain the intention of the parties and their rights as exhibited in their contract; and the position of the parties upon the answer and proof introduced. The con-tract is informally and loosely drawn. The word consideration was used for, or intended to convey, the same idea as the word condi-tion, and with the following words to express the terms to be in-serted in the condition of the bond, and required to be performed before a conveyance could be demanded. It could not have been the intention, that the plaintiff should pay each note as it became due, for one had become due and remained unpaid. On the con-trary, it could not have been the intention of the parties to permit the whole principal and interest to remain.unpaid for an indefinite pe-riod, thereby constantly increasing the amount to be paid. The deed could not be given and the whole contract settled before the last instalment became due ; and the plaintiff could not have expected, nor did the contract contemplate, upon the most liberal construction of it, a longer delay. Perhaps the most correct construction would be, that the plaintiff was to pay the note, which had become due, in a reasonable time, and the others as they should become payable. This only would save the defendant from harm and danger. The contract not only requires the defendant to give a bond, but to con-vey the land upon the plaintiff's performing on his part. The fair conclusion from the testimony of *Jordan* is, that some advance up-on the price was secured to the defendant in his settlement with

Rogers *v.* Saunders.

the plaintiff, and that would constitute a good consideration for the contract. The whole amount of principal and interest having become payable on the seventeenth of *December*, 1834, remained unpaid until the 30th day of *March*, 1835, when it was paid by the defendant. The plaintiff having wholly failed to comply with the terms of the contract, can have no right at law, unless he proves a waiver or assent to this delay. He alleges in his bill, that not being convenient for him to pay the notes at maturity, he made an agreement with the agent of the State, that they should remain uncalled for so long as he should permit the property to remain in the same condition ; and that in consequence of it, the notes remained uncalled for until paid by the defendant. The answer expresses the defendant's disbelief of any such agreement, and denies, that he was advised of it or assented to it. There is no proof of it, and it must be regarded as having no existence. The answer alleges, that the plaintiff gave the defendant a note payable in four months, and that it was agreed, that before the expiration of that time the sums due to the State should be paid and the whole business be finally closed ; and that he was to be paid for his expense and trouble about the business ; and that the timber which had been cut upon the land should be sold and the proceeds applied to the payment of the notes to the State. These allegations contradict the written contract, are not responsive to the bill, are without proof and must also be regarded as having no existence. The rights of the parties rest therefore upon the contract. It is not necessary to detail the testimony introduced to prove an assent to the delay or waiver of the time of performance by the defendant. All the acts and declarations took place, before the last instalment became payable ; and the most that can be made of them is, that the defendant considered the contract as subsisting, and assented to all the previous delay, or waived his objections to it. From the time when the plaintiff, in the autumn of 1834, demanded of the defendant the execution of the bond, and was refused, to the time when the defendant paid the notes, there is no proof of any act or declaration of either party. The land was covered with a growth of wood and timber which appears to have constituted its princi pal value. On the 17th of *December*, 1830, the six lots were

purchased for $1170,40 and one undivided half of them sold on the first of *May*, 1835, for $7839,73.

It remains to state some of the principles upon which courts of equity will or will not decree a specific performance ; and to apply them to the facts presented in this case. It is a matter of discretion in the court, whether or not to decree a specific performance, not dependent however upon the arbitrary pleasure of the Judge, but regulated by general rules and principles. When the contract is in writing, is certain, fair in all its parts, is for an adequate consideration, and is capable of being performed, it is a matter of course for a court of equity to decree performance. 2 *Story's Eq.* § 751. And performance may in a proper case be decreed where the party has lost his remedy at law. *Radcliffe* v. *Warrington*, 12 *Ves.* 331. But laches and negligence in the performance of contracts are not thereby to be countenanced or encouraged, and the party seeking performance must shew, that he has not been in fault, but has taken all proper steps towards a performance on his own part, and has been ready, desirous, and prompt to perform. *Milward* v. *Earl Thanet*, 5 *Ves.* 720, *note (b)* ; *Fonb. Eq.*, ch. 6, § 2.

There has been some difference of opinion whether a contract, which could be enforced by one party only, ought to be decreed to be specifically performed. *Chancellor Kent*, in *Clason* v. *Bailey*, 14 *Johns. R.* 485, says the weight of argument is in favor of the construction, that the agreement concerning lands to be enforced in equity should be mutually binding ; but he reviews the cases, and says the point is too well settled to be now questioned, that it may be thus enforced, if binding upon one party only. This appears now to be the generally received doctrine, and it has been admitted in this State. *Getchell* v. *Jewett*, 4 *Greenl.* 350. The grounds upon which courts of equity have proceeded in such cases appears to be, that the statute of frauds, as decided in the courts of law, requires only the signature of the party to be charged to become legally binding upon him ; and equity, finding a contract legally binding, will decree its performance. Where the contract is binding at law therefore, the want of mutuality is no objection. *Flight* v. *Bolland*, 4 *Russell*, 298. Where its binding efficacy has been lost at law by lapse of time, courts of equity are in the

habit of relieving, when time is not essential to the substance of the contract. Time is of the essence, where the thing sold is of greater or less value according to the effluxion of time, and the sale of a reversion, and of stock, are put as examples of the rule. So when a house is known to have been purchased for a residence at a particular time, and when the parties have by their contract expressly so agreed, time is essential. And in these cases no relief is given against the lapse of time. It is not of the essence of the contract, where the object is security for the payment of money; and in the ordinary case of the sale of an estate, the general object being the sale for an agreed sum, the time of payment is regarded as formal, and that stipulation as meaning, that the purchase shall be completed within a reasonable time, regard being had to all the circumstances. 1 *Young & Collyer*, 415. Time is not however in such cases to be altogether disregarded, but to entitle him to relief where time is not essential, the party asking it must show, that circumstances of a reasonable nature have prevented a strict compliance, or that it has been occasioned by the fault of the other party, or that a strict compliance has been waived. Where he has been guilty of laches, and offers no satisfactory reason for it, and the other party has not waived or acquiesced in it, no relief can be granted. In *Lloyd* v. *Collett,* as reported in 4 *Ves.* 689, note *(b,)* the chancellor says, " I want a case to prove, that where nothing has been done by the parties, this court will hold in a contract of buying and selling, a rule that certainly is not the rule at law, that the time is not an essential part of the contract. Here no step has been taken from the day of sale for six months after the expiration of the time at which the contract was to be completed. If a given default will not do, what length of time will do ? It is true the plaintiff must have considered himself bound after the day ; so he was ; he could not take advantage of his own neglect." In *Guest* v. *Homfray,* 5 *Ves.* 818, the master of the Rolls says, " the only question is, whether the plaintiff has done enough to show, he took all the pains he could to be ready to carry into execution the agreement." " The plaintiff does not seem to me to have done all he ought to have done. It rests entirely upon that point." In *Benedict* v. *Lynch,* 1 *Johns. Ch. R.* 375, this question was very much considered by the chancellor, who states the rule to be, " that

where the party who applies for a specific performance, has omitted to execute his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification or excuse for his delay, and where there is nothing in the acts or conduct of the other party, that amounts to an acquiescence in that delay, the court will not compel a specific performance." And again, " from the review which I have taken of the cases, the general principle appears to be perfectly established, that time is a circumstance of decisive importance in these contracts, but it may be waived by the conduct of the party ; that it is incumbent on the plaintiff calling for a specific performance to show, that he has used due diligence, or if not, that his negligence arose from some just cause ; that it is not necessary for the party resisting the performance to show any particular injury or inconvenience; it is sufficient if he has not acquiesced in the negligence of the plaintiff, but considered it as releasing him." In such cases, the party is regarded in equity as having abandoned his contract. Nor will equity give relief against the lapse of time, where there has been a very material change in the value of the property making a great change in the condition of the parties. In such cases, the utmost watchfulness is expected of the party not to let the contract fall. In *Paine* v. *Mellen, 6 Ves.* 349, the vendor did not perform in time, but the purchaser consented to complete the contract upon certain terms, and before the deeds were executed, the houses were burnt. It was held, that the vendor could be relieved only by proving an actual acceptance of the terms by the purchaser before the loss. In *Brashier* v. *Graty, 6 Wheat.* 539, it is said, " another circumstance, which ought to have great weight is the change in the value of the land." " Had the land fallen in value, he could not have paid the purchase money." Where the price agreed for in the original contract greatly differs from the value, it is an ingredient, which associated with others, will contribute to prevent the interference of a court of equity. *Cathcart* v. *Robinson, 5 Peters,* 264. Nor where from a change of circumstances since the contract, performance would be attended by peculiar hardship. *Perkins* v. *Wright, 3 Har. & McHen.* 324. Nor where the remedies are not mutual, and the chance for gain is all upon one side, and that of loss all upon the other. In *Alley* v. *Deschamps, 13 Ves.* 228, the chan-

cellor says, " it would be very dangerous to permit parties to lie by with a view to see whether the contract will prove a gaining or losing bargain, and according to the event, either abandon it, or considering the lapse of time as nothing to claim a performance." In *Brashier* v. *Graty*, it is said, " *Mr. Brashier* then if he did not execute his part of the contract with punctuality, ought to have executed it before a great change of circumstances took place." " This total want of reciprosity gives increased influence to the objections to a specific performance, which are furnished by this great alteration in the value of the article." Mr. Justice *Story*, in his treatise, says, " but if circumstances of a reasonable nature have disqualified the party from a strict compliance, or he comes *recenti facto* to ask for a specific performance, the suit is treated with indulgence, and generally with favor by the court. But then in such cases it should be clear, that the remedies are mutual ; that there has been no change of circumstances affecting the character or justice of the contract. 2 *Story's Eq.* 87. So where one was entitled to a renewal of a lease for lives, when one life should drop, but was not obliged to renew, having let two lives drop before he applied for a renewal, equity could give no relief. *Bayley* v. *Corporation of Leominster*, 1 *Ves. Jr.* 475 ; *The City of London* v. *Mitford*, 14 *Ves.* 41. And a change of possession, or an advance made as a partial payment will not in such cases make any difference. *Alley* v. *Deschamps*, and *Guest* v. *Homfray*, before cited.

It will be perceived, that the court cannot in this case decree a specific performance without a violation of these well established rules. Allowing that the defendant had waived all compliance up to the time when he refused to give the bond, that left the parties upon their legal rights, and should have put the plaintiff upon his guard to perform punctually, when the time arrived for a final close of the business, and not to cast himself upon the favor of one, who had just admonished him, that he did not mean to perform, if he could avoid it. This refusal to give a bond might have justified the plaintiff in refusing to pay, if the bond had been essential to enable him to obtain the title, but it was not ; the contract which he had, was sufficient for that purpose, for it is agreed in it, that a deed is to be given upon payment. The plaintiff offers no reason for neglecting to pay from the 17th of *December* to 30th of *March*,

Rogers *v.* Saunders.

and during that time there is no proof of a waiver or acquiescence on the part of the defendant. And this takes place in a case in which the plaintiff was required by the change in value to be especially watchful against any thing, that would entitle the defendant to be discharged. Could it be admitted, that the plaintiff has not been guilty of laches, there is no mutuality in the remedy; and although this is no objection, where there is a compliance, yet where there is not, as Mr. Justice *Story* states the law, it is an insuperable one. In addition to this, there has been a most extraordinary change in the value of the property since the contract; it having been sold for more then eleven times the amount agreed to be paid; and while this change has been taking place, all the chance for gain has been on the side of the plaintiff, while the defendant, if there had been a loss occasioned by fire, by trespassers, or otherwise, must have borne it, for he could not compel a performance. According to the rules applicable to sales of estates in *England*, there could not in this case be a decree for a specific performance, and there is less reason for it in this country, and especially in a case relating to lands covered with a growth of timber, and having no fixed or certain value, but rising and falling in price according to the market for lumber, and greatly affected in value by other causes. In this particular hey more nearly resemble stocks; and time is of the essence of the contract in such cases, and no relief can be given. The remark of *Livingston* J., in *Hepburn* v. *Auld,* 5 *Cranch*, 279, applies with great force to this case. Speaking on this subject, he says, " but there is a vast difference between contracts for land in that country and this. There the lands have a known, fixed, and stable value. Here the price is constantly fluctuating and uncertain. A single day often makes a great difference; and in almost every case time is a very material circumstance." But while the plaintiff is not entitled to a decree, the defendant has no claim upon the court for any thing, which they are not obliged by law to give him, for he has refused to give the bond according to his contract, has attempted to vary the contract by parol proof, and has set up other improper grounds of defence, and failed to support them, and he is not entitled to costs.

*Bill dismissed without costs.*

EMERY J. — Dissenting from the opinion of the majority of the Court.

The bill asks for specific performance and relief. He who asks it, should show that he is in a condition to perform his own part of the contract. And in general that the remedies are mutual ; that there has been no change of circumstances affecting the character or justice of the contract ; that compensation for delay can fully and beneficially be given, and that he has shown himself ready, desirous, prompt and eager to perform the contract. If he has been guilty of gross laches, or applies for relief after a long lapse of time, unexplained by equitable circumstances, his bill will be dismissed.

Yet a Court of Equity frequently decrees specific performance, where the action at law has been lost by the default of the very party seeking the specific performance, if it be notwithstanding, conscientious, that the agreement should be performed. And in *Lennon* v. *Napper*, 2 *Sch. & Lef.* 684, the Lord Chancellor says, that in all cases of contracts for estates in land, courts have been in the habit of relieving, when the party from his own neglect had suffered a lapse of time, and from that and other circumstances, could not maintain an action to recover damages at law. And even where nothing exists to prevent his sueing at law, so many things are necessary to enable him to recover at law, that the formalities alone render it very inconvenient and hazardous so to proceed. Nor could in many cases, the legal remedy be adequate to the demands of justice. Relief is granted to the man who has acted fairly, though negligently. 2 *Sch. & Lef.* 684. The courts of equity regard time so far as it respects the good faith and diligence of the parties. But if circumstances of a reasonable nature have disabled the party from a strict compliance, or he comes *recenti facto*, to ask for a specific performance, the suit is treated with indulgence, and generally with favor by the Court.

In the ordinary course of the purchase of an estate, and the fixing of a particular day for the completion of the title, the Court seems to have considered that the general object, being only the sale of the estate for a given sum, the particular day named is merely formal. And the stipulation means in truth, that the purchase shall be completed within a reasonable time, and regard being had to all the circumstances of the case, and the nature of the

title to be made.  *Hepwell* v. *Knight*, 1 *Young & Collyer*, 415.

If the contract be unobjectionable, it is as much a matter of course to decree specific performance as to give damages at law. 3 *Cowen*, 445, 505.  In the sale of lands, time may make part of the essence of the contract, and on default at the day without any just excuse, or any acquiescence, or subsequent waiver, by the other party, the Court will not help the party in default.  *Benedict* v. *Lynch*, 1 *Johns. Ch. R.* 370.

It would be very dangerous to permit parties to lie by with a view to see whether the contract will prove a gaining or a losing bargain, and according to the event either to abandon it, or considering the lapse of time as nothing to claim a specific performance, which is always the subject of discretion.  *Alley* v. *Deschamps*, 13 *Ves. Jr.* 225.

If one come to a court of equity for a specific performance, he must be able to state some contract, legal or equitable, concluded between the parties, which the other one refused to execute.  14 *Ves. Jr.* 408.  The jurisdiction is not dependent upon the form or affected by the form or character of the instrument.  The Court will be satisfied that in substance, the transaction amounts to, and is intended to be, a binding agreement for a specific object, whatever may be the form, or the character of the instrument.  If a bond with a penalty should be made upon a condition to convey certain lands upon the payment of a certain price, it will be deemed in equity an agreement to convey the land at all events, and not to be discharged by the payment of the penalty, though it has assumed the form of a condition only.  *Newl. on Contracts*, c. 17, *p.* 307 to 310; 2 *Story's Eq.* 22.  And the purchaser of land is considered as the equitable owner of the land, and the vendor as the owner of the money.  The purchaser may devise it as land even before the conveyance is made in equity.  *Lingan* v. *Sowray*, 1 *P. Wm.* 172; 2 *Vern.* 679.

Our own *stat.* of *February* 28, 1829, c. 431, provides, that the interest which any one has by virtue of a bond or contract in writing, to a conveyance of real estate upon conditions to be by him performed, whether he be original obligee or assignee, may be attached on mesne process, or on execution and sold, and the purchaser have remedy to compel conveyance by bill in equity.  This

would seem to be a great step towards bringing upon us all the evils or blessings, which are by some, so earnestly desired to be brought to bear upon us, by a court of chancery.

We must dispose of this cause upon an unequivocal meaning of the contract of the parties, and their various acts, which have a relation to the execution of the contracts. *Pratt & al.* v. *Low & Campbell,* 9 *Cranch,* 456, 488.

The bill *affirms distinctly, that the plaintiff was in embarrassed circumstances at the time of making the agreement,* of which he claims specific performance. This *is not denied in the answer,* nor is it pretended that the fact was unknown to the defendant *when* on the 11th of *July,* 1832, he made the contract with the plaintiff. So that there does not appear to have been any change for the worse on the part of the plaintiff. It *does not* present *a case of bankruptcy,* arising *after* the entering into the contract, which might furnish strong reasons for considering it abandoned. The answer admits the purchase of the State of the six lots, and the mode of payment secured by the suretyship of *Jacob O. Rogers* and the plaintiff to the four notes signed by the defendant, alleges that timber was cut on the premises, and it was agreed, that the proceeds should be appropriated to the payment of the notes to the State, and extinguishment of the mortgage, and that the principal part of the timber remained in the stream, into which it was hauled, till after the 11th of *July,* 1832. And the plaintiff received the proceeds to his own use. The answer further alleges, that the defendant being apprehensive that controversies would ensue between him and said *Rogers* on the settlement of their dealings relating to the lands, and being desirous of a speedy adjustment of the same, and to be fully discharged from all further costs and trouble, and to be wholly exonerated from his liability to the State, by reason of said notes, agreed to relinquish to the plaintiff his interest in the lots, and for that purpose, gave the written agreement, referred to in the bill, but the answer also says, that he, the defendant, was also to be paid the costs, expenses, and trouble he had incurred in procuring a deed of the lots, and in the care and management about cutting the timber, which was to be the plaintiff's property. It has been said by high authority, that the motives inducing a party to enter into a contract are not to be considered, unless expressed in

the contract itself. *Bochan* v. *Wood*, 1 *Jacob & Walker*, 422. The answer further alleges that an adjustment was made of their dealings, and the note for $88,27 payable in four months was made on the 11th of *July*, 1832, before the expiration of which, it was agreed, that the whole business should be finally closed. *This establishes a valuable consideration for the contract.* That nothing more was really due to the defendant than the amount of the notes to the State, and the $88,27 seems strongly inferrable from a part of the answer, because the defendant *said unless they were paid,* he should not consider himself holden by the agreement, and would not thereafter be bound by it, nor give a bond, nor a deed.

That part of the answer, which says the plaintiff did not express any intention to perform, appears to be contradicted by the defendant's witness, *Patten,* who says, that on the 7th of *Nov.* 1833, when the defendant asked the plaintiff to pay a note of hand he had against him then, so that he could send the money to *Boston* by the deponent, and take up defendant's note, given to the State for some land, and if he did not, the defendant should not feel bound, or consider himself holden to give *Rogers* a deed of the land, *Rogers* said he would bring or send the money to pay the notes to *Bangor,* before the witness left *Bangor.* The answer further says, the defendant never agreed nor consented to any such arrangement, procured from the land agent as stated in the bill, disbelieves it, *but does not call for proof.* And if he did, it might be very difficult to make it out directly, as the land agent is dead. But the defendant asserts that he was not advised of it, and has never assented to any delay, and it was in violation of the agreement with the plaintiff. The defendant also says, the agreement was not mutual, and he, the defendant could not compel the plaintiff to perform.

The procurement of the bond and offer of it by *Rogers* to the defendant to be executed, is admitted, and so is the tender, on the 1st of *April,* 1835. But the defendant objects, that these acts were not till long after *Saunders* had demanded of the plaintiff performance, and notified him that he would not be holden. And the defendant further alleges, that from the plaintiff's neglect, the defendant was induced to believe that the plaintiff did not intend to comply, unless after the lapse of time, the enhanced value of

said lots or other favorable circumstances should render it expedient for him so to do. And that the defendant on the 30th of *March,* 1835, paid to the Treasurer of the State, his aforesaid notes and interest, and caused the mortgage to be cancelled and discharged. If the right of the plaintiff to redress depends on his having paid the notes to the treasurer, he has no right, for he has not paid them. But is not the substantial meaning of the contract, that so much money shall be the consideration of the deed, and when that was paid, the plaintiff should have the conveyance made agreeably to his direction? Does not the whole case resolve itself into the question whether in a court of equity, the time of performance be of the essence of the contract? And if so, whether there has been a reasonable excuse for the omission to pay?

At the time of entering into the contract of *July* 11, 1832, none of the notes to the State had been paid. One had been payable seven months, and *Saunders,* if he did not know that delay had afterward been procured from the land agent, remarked to *Rogers,* that the State would be glad to take the land back again, if he could not pay the notes. If he did not cut the timber off would give him lenity; he had no doubt he could get lenity. *Saunders* said there was nothing further to be done by said *Rogers* to entitle him to the bond. It does not appear that the land agent had ever felt insecure, or urged the payment of the notes. And all this goes to corroborate the statement of the plaintiff as to the arrangement about the notes, the last of which was not payable till the 17th of *December,* 1834. The plaintiff was surety on the notes for the defendant, to the State, and yet the plaintiff had no indemnity. The whole title was in the defendant, subject to the mortgage. When the agreement of *July* 11, 1832, was made, the plaintiff was amenable for the purchase money. And had he been compelled afterwards to pay it, and had sought from the defendant an indemnity, and the same proof had been introduced in a suit at law, as has been here, no court or jury acting on equitable principles, would have permitted a recovery against the defendant, provided he had tendered a deed of his interest in the land to the plaintiff.

In the fall of 1833, an action was commenced in the names of the defendant and *Jacob O. Rogers,* for taking logs from the land in controversy, against *Daniel A. Cressy,* and he settled it with the

plaintiff by giving him his note for $60. And in the spring of 1834, *Saunders* called at his store for *Rogers* to get pay for the aforesaid trespass, and advised the deponent to settle it; said he had sold out his half of the land to *Rogers*, and that he, the defendant, had no interest in the suit.

In the fall of 1834, *Rogers* made a demand of *Saunders* for a bond for a deed as set forth in the bill. A written bond was presented, which *Saunders* declined executing. In 1834, the plaintiff paid the taxes. In the fall of 1833, the defendant told *Jeffcrds* he had sold his interest in the land to plaintiff.

*Aaron Ingalls* testified, that in *October*, 1834, the plaintiff employed him to examine this land, to see if any one was trespassing on it, and he did examine it. And a few days after, saw defendant, and asked him if he and plaintiff was going to give permits to cut timber, defendant replied, he had sold his interest in the land to the plaintiff. Two or three years ago, perhaps more, he told *Charles Bailey*, he had sold out his part or right in the land back of *Rogers*' mills to the plaintiff. In *June*, 1834, he told *Jacob O. Rogers*, that he had sold out his interest in the land for which they had given their notes to the State to the plaintiff, and inquired if the notes had been paid, and was informed that they had not been demanded, when it was demanded they would see it paid.

No one has heard the plaintiff say, that he abandoned the agreement. None of his acts look like having abandoned it. It is true he did not pay. And certainly, in looking at the contract, informally drawn as it is, there is not in its terms any thing that binds him to pay at a certain time. This is a transcript, "*Oldman, July* 11, 1832, I agree to give *Z. Rogers* a bond for a deed of ½ of 6 lots of land, being the same that I and *J. O. Rogers* bo't of the State, in *December*, 1830, the consideration of said bond, when said *Rogers* shall pay, cause to be pay to the State their claim, and then I agree to deed to order, and 1 further agree to give up all claim for stumpage cut on said land by other people. *James Saunders, Jr.*" A court of equity is to be governed by this principle. It is to examine the contract, not merely as a court of law does to ascertain what the parties have in terms expressed to be the contract, but what is in truth the real intention of the parties, and to

carry that into effect. But in so doing, it would be prudent in the first place, to look carefully at what the parties have expressed; because in general, they must be taken to express what they intend, and the burden ought in good reason to be thrown on those, who assert the contrary. If the thing sold be of greater or less value according to the effluxion of time, it is manifest, that time is of the essence of the contract. And a stipulation as to time, must then be literally complied with in equity, as well as in law. The cases of the sale of stock, and of a reversion, are instances of this. So also, if it appear that the object of one party, known to the other, was, that the property should be conveyed on or before a given period, as the case of a house for residence, or the like. If the parties choose even arbitrarily, provided both of them intend so to do, to stipulate for a particular thing, to be done at a particular time, such a stipulation is to be carried literally into effect, in a court of equity. That is the real contract. The parties had a right to make it. *Why then should a court of equity interfere to make a new contract which the parties have not made?* Hepwell v. Knight, 1 *Young & Collyer*, 415. Looking at the contract of *Saunders*, is it not manifest that no time was intended to be limited, but that as long as the State would omit to enforce the demand, that the plaintiff should have the benefit of the indulgence, provided he was contented with the engagement of the defendant to deed to his order when he should have paid the claim of the State, after having assured the plaintiff that the State would be glad to take back the land, if he did not cut off the timber, and that he could obtain lenity? And the plaintiff had thus been encouraged by the defendant to expect it, and indeed was then enjoying it. Would it be consonant with good faith to destroy that expectation, by urging a more speedy payment than the State saw fit to enforce? I think that the statement of the *four months being the period*, as alleged in the answer *is countervailed by the contract itself, the testimony of Jordan and other circumstances proved.* Morphet v. Jones, 1 *Swans.* 172.

A reasonable excuse is made for the omission to pay. Taking into consideration all these circumstances, it may well be doubted whether the defendant was really serious in his notice on *Nov.* 7, 1833. And if he were so, his subsequent conduct up to *October,*

1834, when he had the conversation with *Ingalls*, goes to show an acquiescence in the proceedings of the plaintiff. For in *June*, 1834, he was apprised that no demand had been made of the notes, that they were not paid. And he did not express any dissatisfaction then to *Jacob*, nor afterwards to *Ingalls* in *Oct.* 1834, against the plaintiff for his delay, although the subject of granting permits for cutting timber, was brought directly to his notice. In the fall after this transaction, he declined giving the bond to the plaintiff. And yet the last note had not become payable.

[I am aware of the argument of *Livingston* J. in *Hepburn* v. *Auld*, 5 *Cranch*, 279, raised in respect to a claim originating in 1799, to assign a certain contract in payment of a debt, but think it cannot be invoked as bearing on the facts in this case. That contract respected 6000 acres of land in *Ohio*, and after great delay of nearly twenty years, to get a good title to the land, the bill was brought to compel the defendant to take the assigned property and discharge the debt. And though that bill was dismissed not because time was material, which the court omitted to decide, but held that if a good title could be procured at the decree, the specific performance would be granted. The bill was dismissed, but in effect supported by the result of a suit to compel payment of the debt, by *deciding that the tender of the assignment was good*, which had before in the Supreme Court's judgment been held not to have been presented to the court *in pleading, as well tendered*. *Hepburn & Dundas* v. *Auld*, 1 *Cranch*, 321. And though the bill was dismissed, one of the court said he supported the decision because the person who sought payment of the debt would now get his pay in no other way than by the assignment. Besides, if the English rule suggested by *Livingston* as *inapplicable* to our country, be considered in regard *to value*, it should also be considered as *inapplicable to our modes of dealing*. For in all the English cases, there is not a single one precisely like this, nor indeed substantially. So of *Brazier* v. *Gratz*, 6 *Wheat.* 528. *Gratz* of *Philadelphia* had purchased of one *Craig* of *Kentucky*, a tract of land, of 1000 acres by the survey. No patent had then issued. Afterward, one was issued in *Craig's* name, who sold part to *Keyser*. *Gratz* sued *Craig & Keyser* to compel a conveyance; *Gratz* in the mean time having sold 824 acres of it to *Robert Barr*.

Rogers *v.* Saunders.

*Brazier,* who married *Barr's* daughter, came to *Philadelphia*, and on the 2d of *March*, 1807, purchased the residue of the land of *Gratz*, estimated at 302 acres, while the suit was pending, and gave his notes for $6795, payable in 6, 12 and 18 months, deducting $250 allowed *Brazier* toward costs of prosecuting the suits pending, which *Brazier undertook to manage at his own expense.* No progress was made in the suits till 1811, and *Gratz* had to pay the officers of the court their fees. Then *Gratz* offered to convey the land to *Brazier*, if he would pay his notes, or to rescind the contract. In 1811 *Gratz* died. *Brazier* had for some time been embarrassed, and then became notoriously insolvent. In *July*, 1812, the heirs of *Gratz* offered to convey on payment of *Brazier's* notes. No payment being made, the heirs of *Gratz* prosecuted the suits with vigor, and they were successful in 1813. The lands soon after rose in value. Then *Brazier* made an arrangement with one *Saunders ;* and the heirs considering the contract with *Brazier* of no validity, acknowledged the tender in *Dec.* 1813 ; and then *Brazier* sued in *Kentucky* for specific performance. Thus, almost 7 years after the contract, could any thing *like diligence be pretended in managing the suits at his expense.*

The case of *Lloyd & Young* v. *Collat*, 4 *Brs. C. C.* 469, cited *Harrington* v. *Wheeler*, 4 *Ves. Jr.* 689, noticed again in *Omerod* v. *Hardman*, 5 *Ves. Jr.* 737. The chancellor says, that the conduct of the parties, inevitable accident, &c., might induce the court to relieve. And he inquires, is there any case in which without any previous communication at all between the parties, the time has been suffered to elapse. In most of the cases there have been steps taken. That was a case by vender, who had given no abstract nor filed a bill till 16th *November*, though the contract was to have been completed on the 25th of *March* preceding. The Lord Chancellor considered the conduct of the vendee, as evidence of an abandonment of his contract.

The defendant on the 10th of *August*, 1792, agreed by writing to purchase the premises for £2609,17 the purchase to be completed on or before the 25th of *March*, 1793, and the defendant paid *Young*, the auctioneer, £100 as a deposit. In defendant's answer, he stated that the value of the ground rents had diminished £560 and upwards.

In *Gibson* v. *Patterson,* application was made to the defendant within the time, and he said he *would not,* but *would go to Scotland to avoid being compelled to do so,* performance decreed, if good title could be made and costs. That too was the case of vendor. *Guest* v. *Homfray,* 5 *Ves.* 818, was a case by vendor to obtain specific performance of an agreement to sell unfinished houses in *Cardiff,* in fee for £800 by instalment. The agreement was *Jan.* 31, 1798. Keys were then delivered to defendant. No abstract was delivered till *April* 18, though demanded the 1st. Objections were made against the title, not obviated at the hearing. *June* 2d, 1798, defendant took another house in *Landaff.* The master of the Rolls still says, that if they had cautioned the defendant, and *told him they were going* on to make out the title, *and were in hopes of doing it,* and shown *a probable ground* to him that they might make a good title, "*I should perhaps not have thought a year too long.* Stress too was laid in that case, that the defendant had stated that the contract was at an end, and the plaintiff's solicitor had not stated that the conversation was not so. But there was no evidence that even when the abstract was sent back, he said the defendant was to be still bound, and was not released; and desired him *to take notice of that.*

*Bayley* v. *Corporation of Leominster,* 1 *Ves. Jr.* 475. On neglect to apply for a renewal from 1763 to 1792, the plaintiffs should have applied when *one life dropt,* but omitted till *two lives had expired.* Defendants were held not bound to renew. In *City of London* v. *Mitford,* 14 *Ves.* 41, a renewal of a lease for 40 years and covenant to renew every 40 years was claimed. The city had taken possession of part of the property for public purposes, between 1736, when the first lease of 40 years was executed, and 1773, and attempted to gain some advantage by obtaining a lease from a widow, *Mrs. Turner,* of a moiety of which she was seized for life. It remained till *Mrs. Turner's* death in 1800. In 1802 the plaintiffs filed their bills, and in 1807 it was determined. And the question was, whether after the change in the property, without the consent of defendants, the city can call for the execution of a lease in its nature and terms such, that the enjoyment of the property in the mode in which it was to be enjoyed, is utterly impracticable. And if the city have

thus put it out of the power of the lessor to grant a lease, securing the enjoyment according to the stipulations, they cannot insist, that as the lessor has thus lost his right as between him and the committee of the bridge, he shall therefore execute the lease. The chancellor thought, the circumstances make it impossible at this day to give a specific execution of this contract. The bill was dismissed with costs.

In the present case, though no act was done between the demand of the bond in the fall of 1834, and it was refused, and the time when the defendant chose without notice to take up the notes; *yet that was a fault on the part of the defendant, and he ought not to be allowed to shelter himself from accountability on that account ; the very refusal constituted an apology and excuse for the plaintiff.*

What is evidence of being ready, desirous, prompt, and eager according to English decisions ? In *Milward* v. *Earl of Thanet,* in note to 5 *Ves.* 720, *the parties differed as to the construction of an agreement,* and the bill was delayed 7 years ! Can it be surprising that the bill was dismissed ? Yet this case was the origin of the remark of Lord *Alvanly,* then master of the rolls, that a party cannot call upon a court of equity for a specific performance, unless he had shown *himself ready, desirous, prompt and eager.* This was in *March,* 1801. But in the case, the *Marquis of Hartford* v. *Barre,* and *Aston* v. *Barre,* 5 *Ves. Jr.* 719, on the 6th of *Feb.* 1801, the court held, that *the filing of a bill by a vendor* 14 *months after the correspondence upon objections to the title had ceased, was in season, defendant returning no answer to a letter threatening a bill, nor having called for his deposit.* It was referred to a master. The defendant in his answer submitted that at that distance of time, he was induced to consider the contract abandoned. The chancellor observed, that " the plaintiffs took a good deal of time, upon their saying they should be under the necessity of filing a bill, but one may *easily imagine circumstances might have happened that would have made it peevish to have done it immediately."*

No change in the character or justice of the contract is here made known, 2 *Story's Eq.* 87, and compensation for the delay can be fully and beneficially given. Rules in equity cannot be

more exclusive and positive than statutes, and in them a reasonable and just construction is to be made, so as not to multiply forfeitures or penalties. Yet *here a forfeiture is intended to be effected!*

In *Arminger* v. *Clark, Bunb. Rep.* 111, 112; the Lord Chief Baron took this difference, if a man comes for a specific performance as to the land itself, a court of equity ought to carry it into execution, because there is no remedy at law, but if it is to have performance in payment of money, they may have remedy for that at law.

In the *Earl of Ross* v. *Elizabeth Worsop,* Widow *&* al. 1 *Brown's Parliamentary cases,* 281; it was held, that where a lessor covenants for the perpetual renewal of a lease, upon the lessee's naming a new life and paying a fine within a certain time after the death of any of the *cestui que vies,* a court of equity will, upon slight circumstances, relieve the lessee against a forfeiture for not literally complying with the terms of the covenant, and in this case, determined in 1740, Sir *Dudley Rider & J. Browne,* opposing the application for renewal, argued, that the proviso was intended to be strictly and precisely executed. And the rather because there was not a mutual stipulation for renewal, the Earl being bound to renew upon payment of the fine, and naming a new life within the time limited for that purpose, but Sir *Thomas Worsop* and his heirs though liable for the payment of the £100 upon the death of a certain *que vie,* were not obliged to add any farther life or accept of a renewal. The renewal was decreed before the appeal to Parliament, and that decree was affirmed with costs. The defendant is more in the nature of a trustee, who is not permitted to buy for his own advantage. See 10 *Ves. Jr., Ex parte Bennett,* 381, at page 393, 394; *Legard* v. *Hodges,* 1 *Ves. Jr.* 477. The demand of the bond was made in the fall of 1834 and refused, and supposing that " the most that can be made of the acts and declarations before that time be that they go to show that the defendant considered the contract as subsisting, and assented to all the previous delay;" *the bond being* then *refused,* was *enough to paralize exertions of the plaintiff.* Certainly it would relieve the case from the pretence, that hazard was thrown on the defendant from hazard of fire between that time and the 30th of *March,* 1835, when the defendant chose to pay. *No one has heard of timber land suffering from fire late in the Autumn and Winter.* " When-

Rogers *v.* Saunders.

ever it is attempted to lay down fixed principles, care is to be taken that they are to be applied according to the circumstances of each case. If a case stand directly on the same ground in every word and circumstance with that which is being decided, it should be governed by it. 1 *East*, 541. So if the facts cannot be distinguished in effect. 3 *Barn. & Adolph.* 36."

" A favored right the court should not suffer to be defeated by a technical and critical interpretation of a concession made by an ignorant man in a case in which the justice as well as the law was strongly with him. The rule of construction ought to be plain and simple without refinement and subtlety."

In the case, *Alley* v. *Deschamps*, 13 *Ves. Jr.* 225, a bankruptcy of *Horne* had intervened. The agreement was in 1797. Having paid £100, he became bankrupt in 1800. The premises had been purchased by the *London Dock Company*, for £3500, and the assignee claimed part of the money. The Lord Chancellor called it an extravagant case. And he took it that the agreement was not abandoned or rescinded, though there was evidence for that. This was decided in 1806. Afterwards, in 1807, in *Hearne* v. *Tenant*, 13 *Ves. Jr.* 287, on a motion to restrain an ejectment, the plaintiff was assignee of a lease of a house demised by the defendant. Upon the expiration of the lease, a treaty for a new lease took place, the defendant insisting upon a rent of £84, and the sum of 1000 guineas. The plaintiff, after fruitless endeavors to procure an abatement, consented to give that rent and premium. A memorandum was put down in writing, dated the 23d of *Oct.* expressing that the lease was to be granted for 24 years, to commence upon the expiration of the old lease, *upon condition* of the plaintiffs paying on or before the end of the month 1000 guineas. Two copies of the memorandum were signed, plaintiff taking one the defendant the other. After the expiration mentioned in the memorandum, for payment of the 1000 guineas, the plaintiff calling on the defendant apologized for not bringing the money. Plaintiff produced the memorandum. The defendant, taking it, observed, that the time of payment was expired, and therefore the memorandums were of no use, and it was better to destroy them, and he then took the other out of the bureau and tore them both. The answer stated as to that transaction, that the plaintiff did not ex-

Rogers *v.* Saunders.

press any disapprobation nor did he say he agreed to it, but entreated a week or fortnight further time. The Lord Chancellor says, the true standard now is, that though the party has not a title in law as he has not complied with the terms, so as to entitle him to an action, as to the time, for instance, yet if the time though introduced, as some time must be fixed where something is to be done on one side, as a consideration for something to be done on the other, is not the essence of the contract, a material object, to which they looked on the first conception of it? Even though *the lapse of time* has *not arisen from accident.* A court of equity will compel the execution of the contract upon this ground *that the one party is ready to perform, and the other party may have a performance, in substance,* if he would permit it. And this the Lord Chancellor says, is the principle upon which the Court acts now, upon all the authorities brought to the true standard. The injunction was granted until the hearing. On the plainest principles of law, if one having covenanted to convey, acts *mala fide,* and refuses to convey, because the property has increased in value, and with a view of putting the enhanced value in his own pocket, he is liable to an action for damages. *Baldwin* v. *Munn,* 2 *Wend.* 399.]

Returning now to *Rogers* and *Saunders,* the parties now in conflict, we become convinced, that afterward on the 29th of *March,* 1835, *without apprizing the plaintiff of his design, and without any new demand being made of him, and without any intimation from the State that payment was required, Saunders,* the defendant, proceeds to pay the notes to the Treasurer, and have the mortgage cancelled. *For what purpose could this have been done but to speculate on events?* As soon as the plaintiff was informed of this course, he came freshly and zealously to preserve his rights. And on the first day of *April,* 1835, tendered all the money to defendant, and demanded a deed. It was refused. And on the 8th of *April,* 1835, he filed his bill in this suit for relief.

Without any inclination to encourage laches, I am not satisfied that the plaintiff has conducted unfairly; and his negligence may, at first, have received some countenance from the defendant. It appears, to me, *that the defendant,* on being paid the amount of all the notes and interest given to the State, and the balance of the

Rogers *v.* Saunders.

plaintiff's note to the defendant, *ought to execute, deliver and acknowledge to the plaintiff a deed of the moiety claimed in the bill.*
But I should not give costs.

See 1 *Vesey, Jr.* 477, *Legard* v. *Hodges.*  The Lord Chancellor "considers it a universal maxim, that whenever persons agree concerning any particular subject, *that,* in a court of equity, as against the party himself, and any claiming under him voluntarily, or with notice, raises a trust."

The original opinion drawn by Judge *Emery,* was returned to him on the 27th of *February,* 1839.  It was accompanied by that drawn by Judge *Shepley.* After perusing this last, Judge *Emery* could not concur in the conclusion, at which the Chief Justice, and Judge S. had arrived, and therefore made to his own opinion the additions contained between the [ on the 109th and the ] on the 115th page.  All the rest is as the opinion was originally drawn, and communicated to the Chief Justice and Judge *Shepley,* excepting the above extract from 1st *Ves. Jr.* 477,

NOTE.  The Reporter has taken the liberty to insert the printed pages in place of those in the manuscript opinion.