EASTMAN *v.* PLUMER & ALS.

The granting of a specific performance of a contract for the sale of land is not a matter of right to which the party is entitled when he has proved his contract, but is always a matter of sound and reasonable discretion, on the part of the court, in view of all the circumstances of the case.

In exercising this sound discretion the court will not decree a specific performance in cases of fraud or mistake, or of a hard and unreasonable bargain, or in case of great inadequacy or exorbitancy of price, or where the decree would in any way produce injustice.

Those who desire to secure the aid of equity in enforcing the performance of contracts must show a willingness and a readiness to perform and abide by them.

If either party to a contract of sale fails or refuses to claim or act under the contract for such a length of time as to give the impression that he has waived or abandoned the sale or purchase, and especially if the circumstances justify the belief that his intention was to perform the contract only in case it suited his interest, he will necessarily forfeit all claim to equity.

There are many equitable considerations not amounting to illegality or actual fraud in the contract, which may properly induce a court of equity to refuse to decree a specific performance of the contract, and to leave the party to his remedy at law for a non-performance, which would not be sufficient to warrant the court in setting aside the contract of sale.

There are few cases in which courts of equity will insist on the maxim, that he who seeks equity must do equity, with more rigor than in those of suits for specific performance of contracts.

Ordinarily a party who has once elected to rescind a contract, and sought to repudiate it, and failed, will not afterwards be heard where he calls on equity to decree specific performance of such contract.

In Equity. Bill for specific performance of a contract for the conveyance of certain real estate in Gilford. The defendants are James H. Plumer, of Gilford, and Abby P. Plumer, his wife, Josiah B. French, of Lowell, Mass., the Winnipisseogee Lake Cotton and Woollen Manufacturing Company, a corporation in this State, George W. Young and James Worster, of Concord, George O. Worster, of said Concord, administrator, with the will annexed of the estate of Susan M. Worster, late of said Concord, deceased, Sarah W. Worster, of said Concord, wife of said James Worster, and Sarah J. Worster, of said Concord, single woman.

The bill alleges that the said James H. and Abby P. Plumer, being seized and possessed of all the land on that part of the farm in Gilford formerly occupied by Jacob Rowell, then deceased, which then was or could be overflowed or in any way injured by the waters of the bay adjoining said farm, as it then was, or could be raised and kept up by the dam situated at Lake Village, so called, and owned by said Lake Company, or any other dam not exceeding the height of said dam on the twenty-fifth day of August, 1851, by a certain indenture of that date by them signed, sealed, witnessed, acknowledged and recorded, leased one undivided half of the same in common with the said James H. and Abby P. Plumer to one George W. Young, then of Meredith, his heirs and assigns, so long as said Young should pay a rent of five dollars per year, at a time therein specified, to said Plumers, or one of them, the said Plumers reserving all the wood and grass of any description which there was or might be standing or growing on said land during said time ; and in and by said indenture the said James H. and Abby P. Plumer bound themselves, their heirs and assigns, unto the said Young, his heirs and assigns, in consideration of one dollar paid by said Young, that if said Young, his heirs or assigns, should pay or tender to said Plumers, or either of them, the amount of his promissory note of even date with said indentures for the sum of $320, to convey to said Young his heirs or assigns, by a good and sufficient warranty deed in common form, the same premises leased as above described.

The bill then alleges the payment of the rent according to the terms of the lease in 1852 and 1853, by said Young, and that on the 28th day of February, 1854, he by deed conveyed to the plaintiff all his right, title and interest in said indenture of August 25, 1851, and all the interest he had by virtue thereof in said land.

It alleges that on the 2d day of October, 1851, said Young by deed

leased to said James Worster, his heirs and assigns, an undivided half in common with said Young, of the same rights as leased to said Young by said Plumers, August 25, 1851.

That said James Worster sold and conveyed all his interest by virtue 'of said lease of October 2, 1851, to one Susan M. Worster, his daughter, by deed dated April 19, 1853.

That said Susan M. Worster, having made her last will and testament in which she bequeathed and devised her interest in said premises to her mother, Sarah W. Worster, wife of said James Worster, and to her sister, Sarah J. Worster, on the 22d day of June, 1860, died; that her said will was duly proved, approved and allowed, and the said George O. Worster was duly appointed administrator, with the will annexed, of her estate; that he accepted said trust and still holds the same.

That said Thomas Eastman conveyed to said Sarah W. Worster and Sarah J. Worster, by deed dated April 22, 1861, to be held in common and undivided with said Eastman, one half of all the rights and interests of any name and kind which he then had or might thereafter acquire by virtue of said indenture, dated August 25, 1851, it being provided that if said instrument, from said Young to said James Worster, of October 2, 1851, conveyed one half of all the rights which said Young acquired by virtue of said indenture dated August 25, 1851, from said Plumers to him, then said deed from said Eastman to Sarah W. and Sarah J. Worster, of April 22, 1861, should be void.

That said James Worster and Sarah W. Worster, his wife, in her right, and the said Sarah J. Worster, on the 23d day of April, 1862, released and quitclaimed to said Eastman, his heirs and assigns, all the right, title and interest which they then had in said premises, being the same premises described in said indenture of August 25, 1851, from Plumers to Young.

That said Young, after the execution of said indenture, to wit, August 25, 1851, paid his said promissory note for $320, to said James H. Plumer, but that said James H. and Abby P. Plumer have never conveyed the said premises to said Young nor to the plaintiff.

That said Eastman made a demand for a deed of said premises, upon said James H. and Abby P. Plumer, December 31, 1855, and that he again demanded a deed of the same premises, April 26, 1862, and on both said occasions presented a deed properly drawn and ready to be executed, and requested them to execute the same, but that said Plumers have ever neglected and refused, and still do neglect and refuse to convey to plaintiff the premises hereinbefore described, agreeably to the tenor of said indenture, dated August 25, 1851.

The bill further alleges that on the 24th day of December, 1853, said Lake Company sued out a writ of attachment against said George W. Young, returnable at the court of Common Pleas, Belknap Co., February Term, 1854, on which writ all the right and interest which said Young had in the land hereinbefore described, was attached on the 26th day of December, 1853, and said suit having been duly entered in said court, was continued from term to term to the February Term, 1860, when said company recovered judgment against said Young, for $373.-

09 damages, and $83.21 costs of suit; that execution was duly issued thereon; that, on the 30th day of April, 1860, all the right which the said Young had on said 26th day of December, 1853, or which he might then have, to receive a conveyance of the premises hereinbefore described, from the said James H. and Abby P. Plumer, was sold on said execution and conveyed to Josiah B. French, the agent for said Lake Company, for $451, by B. M. Sanborn, a deputy sheriff.

That, on the 30th day of April, 1861, said plaintiff tendered to said French the amount of money and interest thereon, which he had paid for said Young's right and interest in the premises aforesaid.

That the said James H. and Abby P. Plumer, on the 11th day of August, 1859, made and executed their deed of warranty to said Lake Company, purporting to convey to said company all that part of the Jacob Rowell farm which is embraced in said indenture of August 25, 1851, and that on the 15th day of August, 1859, said Plumers executed to said company a deed of quitclaim purporting to release to said company all their right and interest in said indenture of August 25, 1851, and that said Lake Company by its officers and agents, at the time of taking said last mentioned conveyances, and long before, had full knowledge of said indenture dated August 25, 1851, and that the note therein mentioned for $320, had been paid, and that said James H. and Abby P. Plumer were bound, both in law and equity, to execute a deed as therein provided.

Wherefore, the plaintiff prays that the said James H. and Abby P. Plumer may be compelled to convey to the plaintiff by a good and sufficient warrantee deed in common form, one undivided half of all the land on that part of the farm in said Gilford, formerly occupied by Jacob Rowell, now deceased, which, on the 25th day of August, 1851, was or could be overflowed or in any way injured by the waters of the bay adjoining said farm, as it then was or could be raised and kept up by the dam situated at Lake Village, and owned by said Lake Company, or any other dam not exceeding the height of said dam; and also that the said Josiah B. French may be compelled to quitclaim and release to the plaintiff all the interest which he acquired by virtue of said deed from said B. M. Sanborn, and all the interest he may have acquired by virtue of any conveyance from said James H. and Abby P. Plumer, or that a perpetual injunction may be granted forbidding said French from setting up any title or making any claim to said premises; and that a similar injunction be granted forbidding said Lake Company from setting up any title or making any claim to said premises by virtue of said deeds of August 11 and August 15, 1859, and forbidding the said Young and all the Worsters, the other defendants, from disputing, controverting, or objecting to the right and authority of the plaintiff, by virtue of the several conveyances hereinbefore described, to receive a deed of said premises as provided in said indenture dated August 25, 1851.

The bill was taken *pro confesso*, as to all the defendants, except Plumer and his wife and French, who answered for himself and said Lake Company.

James H. and Abby P. Plumer, in their answer, admit that being

seized in the right of said Abby, of the said Jacob Rowell farm adjoining said Long Bay, and including the premises in question, on the 25th day of August, 1851, they made and executed to said Young the indenture described in said bill, and received from said Young a note of that date for $320, and obligated themselves, upon the payment of said note, to convey said premises by a good and sufficient warrantee deed to said Young, his heirs and assigns. But they deny that the annual rent of five dollars was ever paid or tendered to them or either of them, and they deny that plaintiff is entitled to the relief prayed for in his bill, because he has not set forth such a performance of the covenants on his part, or on the part of those under whom he claims as may entitle him to a conveyance of the demanded premises.

They admit the execution of the deed of release from Young to the plaintiff of February 28, 1854, conveying all said Young's right, title and interest in the land and flowage described in said lease of August 25, 1851, from said Plumers to said Young.

They admit that, on the said 25th day of August, 1851, said Young made and delivered his promissory note payable to said J. H. Plumer or order, for $320, with interest, but they deny that the same has ever been paid or tendered by said Young, or any other person for him, unless the same should be held to be paid from the facts and circumstances following : About ten days after said note was made and delivered as aforesaid, the same was given back to said Young, and another note was made and delivered by him of like date and amount payable to one Josiah F. Roby, or order, with interest, in consideration of certain lands, then conveyed by said Roby to said Plumer, whereon the said Young and J. H. Plumer and one John M. Potter were signers; which note the said Roby thereafter sold and delivered to one James Bell, and which the plaintiff subsequently purchased of said Bell, through said Young, acting as his agent, as defendants are informed and believe, and said plaintiff has since held said note against, and has demanded pay thereon, of the said James H. Plumer, which said note is still outstanding against the said Young with said Plumer's name thereon as aforesaid, and has never been paid by said·Young as defendants are informed and believe. But defendants say they are ready and willing at any time, upon the discharge of said James H. Plumer from all liability in consequence of his name being on said note, to pay to said Young or whoever may be entitled to receive the same, the principal of said note and all interest thereon.

They admit that they have not given to said Young, or to the plaintiff, any other coveyance than the indenture aforesaid.

They admit the demand on them for a deed of the premises in question, in December, 1855, and also in April, 1862, but allege that they were not bound to convey said premises for various reasons, not here important to state.

They allege that the Lake Company is a corporation duly established by law in this State, and those under whom they hold had, by means of a dam erected at Lake Village, in 1829, and by other dams since erected in place thereof, and not exceeding the same in height, raised and

kept up the water in said bay above and adjoining said Rowell land, more than twenty years prior to the date of said indenture from said defendants to said Young; that said defendants were tenants in common with Stephen S. Ayer, his wife, Mary E. Ayer, of the Rowell farm, by descent thereof, to their said wives Abby and Mary, as the devisees of their grandfather, Moses Rowell, upon the decease of their father, said Jacob Rowell, on the 4th day of June, 1851; and on the 20th day of August, 1851, said parties made partition of said farm, and said Ayer and wife released the land adjoining said bay to the defendants.

And the defendant, James H. Plumer, says that prior to and at the time of the making of said indenture, the said Young called upon and had various interviews and conversations with him, wherein he solicited a conveyance of water rights on said shore, and represented and promised that if the defendants would convey to him an undivided interest or share in the flowage on said shore, that he and one James Worster, to whom he intended to convey an interest with himself (and whom he represented to be of great skill, experience and knowledge in such suits,) would prosecute said claim at their own expense against the owners of said dam, and would compel them to pay the defendants such a sum of money as they should demand, and such a sum as would enable him, the said Young, to live without more work, and that they would not settle for such rights as the defendants might convey to him, until the owners of said dam should settle with the defendants for whatever sum they might demand for their claim, and the defendants might set their price at whatever sum they saw fit, and that any interest in said shore however slight, which the defendants might convey to him, would be sufficient to enable him and the said Worster to prosecute said suit; whereupon the defendants, confiding in the said representations and promises made to them by the said Young, and in the skill, ability and experience of said Worster in prosecuting such claims, made and executed the said indenture to him, the said James Worster advising and assisting therein, and the defendants are informed and believe that the said Young shortly thereafter, to wit, on the second day of October, A. D. 1851, conveyed to the said Worster an undivided share of his supposed rights, title and interest in said indenture.

The defendants say that the said shore is formed by a bank rising nearly perpendicular from the edge of the water, closely packed with boulders and small rocks, and varying in height from two to four feet with the bed below, covered with water and thickly paved with rocks and pebbles, and destitute and incapable of vegetation, and is of none or of merely nominal value.

And the said James H. Plumer says that he has been informed, and believes that the plaintiff before and at the time of taking said assignment from said Young, dated February twenty-eighth, 1854, had been advised and was aware of the object and purpose of said Young in procuring the said indenture from the defendants, as is hereinbefore set forth, and of the participation therein of said Worster; and that, before the filing of his said bill, the plaintiffs bargained and agreed with said Young and Worster, and other persons to the defendants unknown, that

upon the payment by them to the plaintiff of certain sums and of certain expenses and costs of prosecuting this and other suits, and such other proceedings as should be necessary to force the Winnipisseogee Lake Cotton and Woollen Manufacturing Company to a settlement, by the payment of exorbitant sums of money aforesaid, for said shore or water rights, the plaintiff would commence, or suffer to be commenced in his name, by his said confederates, this and all other necessary proceedings, and that whatever sums of money might be so obtained should be divided between said parties or persons according to their payments or interests in said supposed leased property or shore, or other and similar bargain or arrangement of like import and effect.

The defendants say that they were married in the year 1843, have always resided upon and near said Rowell farm and near the shore of said bay, that they were knowing at the time to the conveyance made by the said Jacob Rowell on the thirtieth day of July, A. D. 1845, to the said Winnipisseogee Lake Cotton and Woollen Manufacturing Company by a warrantee deed in common form, of the right and easement to flow all said shore of the said Rowell farm as high as they then did or have since flowed the same by means of said dam at Lake Village, and of the negotiations therefor preceding said conveyance between the said parties, and did not object; that subsequent to the date of said indenture the defendants were advised by counsel and believed that their title to the land on said shore might be subject to the right of said company to flow the same as hereinbefore stated, by their dam at Lake Village, and considering that they had been misled and deceived by the said Young, on the eleventh day of August, A. D. 1859, by their warrantee deed of that date in common form, conveyed the whole of said shore by metes and bounds to the said Winnipisseogee Lake Cotton and Woollen Manufacturing Company, and on the fifteenth day of the same month by deed of release and quitclaim conveyed all their right, title and interest in said indenture to said company, since which conveyances the defendants say they have had no right, title or interest in said indenture, or in the lands covered by said lease if any such lands can be found.

The said French admits the suing out of a writ of attachment in favor of the said Lake Company against said Young, attachment thereon, entry in court, continuance, judgment, execution, levy and sale to himself, the sheriff's deed of sale, and the subsequent tender by said James Worster as set forth in plaintiff's bill.

He also claims that said Lake Company had acquired the right by prescription previous to the indenture from said Plumers to Young, of August 25, 1851, and also that when said Jacob Rowell conveyed with warranty all said rights of flowage by his deed of July 30, 1845, to said Lake Company, his daughter and heir, Abby P. Plumer, and her husband, the said James H. Plumer, knew of the negotiations by said Lake Company for said water rights, and were present when said deed was given, and did not object or claim any interest therein, but acquiesced in the same, and have since acquired no other title to said premises, except as devisees of said Moses Rowell, deceased, and that said

James H. and Abby P. Plumer were thereby estopped to claim any rights in said shore, adverse to said Lake Company.

And the said French says that he has been informed and believes that the said Young entered into a conspiracy with said Worster and other persons whose names are to him unknown, and procured said lease from said James H. and Abby P. Plumer, to be made, fraudulently and corruptly to extort a large sum of money from said Lake Company, and for that purpose to procure a suit or suits to be commenced against said Lake Company, on said pretended title so acquired by said lease; that said Eastman was knowing to, and was advised of the purpose aforesaid, before taking the said conveyance set up in his said bill, from said Young, and has himself entered into a conspiracy with said Young, Worster, Thomas J. Plumer, and Joseph W. Robinson, and other persons unknown, and procured this suit to be commenced for the same purpose of extorting money from said Lake Company fraudulently and without just cause and consideration, and has entered into an agreement and understanding with his said co-conspirators to divide equally or according to their several shares, interests, or proportions, the money so fraudulently intended to be taken and extorted from said Lake Company.

He says, that, for the purpose of ending all controversy and dispute concerning the rights in question on said shore, said Lake Company, on the eleventh day of August, A. D. 1859, and on the fifteenth day of the same month, took the conveyances set forth in the answers of said James H. and Abby P. Plumer, of said shore land and interest in said lease.

He says, that, on the 30th day of April, 1860, said Lake Company having said execution against said Young, and said Young being insolvent, and having no visible property, and said Lake Company regarding said execution as of little or no value, caused said sale to be made as set forth in the plaintiff's bill, and he, the said French, became the purchaser; that he gave notice at the time and place of sale, and before said sale that said Lake Company were the owners of said shore lands, and of all the rights, &c., thereto belonging; that he bid off said premises and took the deed of sale to himself, but only for the benefit and interest of said Lake Company.

*E. A. Hibbard*, for plaintiff.

The plaintiff asks the court to compel Plumer and wife to do just what they agreed (in writing under seal) to do. The $320 note has been paid. This is substantially conceded. If the giving of the second note did not pay the first, the money paid by Young to Bell paid both. See copy of judgment; also deposition of George W. Stevens. The first year's rent was also paid as provided for in the agreement. See G. W. Young's deposition 26.

The Lake Company clearly can make no defense for the Plumers by virtue of the conveyance to them as they took their title with full notice of the agreement to convey, as charged in the bill and not denied. They expressly engaged to defend against any suit which might be

brought to procure a deed.   See J. H. Plumer's first deposition, 94; also 86, and copy of agreement annexed; also T. J. Plumer's deposition, 30.   It appears that Mr. Bell had knowledge of the agreement before he entered into any negotiations with Plumer, and before the "large expenditures" referred to in the company's answer.

As the rights of creditors are not involved there certainly is nothing in the objection that the conveyance from Young to the plaintiff was in the nature of a mortgage, nor in the objection that the transfer from the Worsters (made to entitle the plaintiff to bring the suit in his name alone) was without consideration.

The mortgage of April 30, 1860, could not weaken the title the plaintiff already had.

It is charged that the plaintiff intends to use the deed for purposes of speculation.   If the Lake Company were the plaintiffs, the question whether they intend to exact 100 times its cost for the land from some poor man who must have it would amount to but very little.

In this case the balance of the equities is really in the plaintiff's favor.   The agreement was doubtless procured for the purpose of selling the land to the company at a profit, though not at an unreasonable profit.   We have as yet no law to prohibit the sale of property at more than its cost or even more than it is worth.   But the plaintiff had nothing to do with the transaction till afterwards and then only to collect a debt.   He attempted to get his money back without resorting to this suit, but Plumer, acting in concert with the company, concluded to defraud him out of the money and land also.   Plumer said Bell hired him not to convey.   See T. J. Plumer's deposition, 42.   The defendants have shown that the plaintiff a short time before this suit was commenced offered to accept what he had paid out in full satisfaction.   See plaintiff's second deposition, 35.   Afterwards, when the company had concluded to accept this offer, (if they ever did,) the plaintiff was obliged to decline on account of the arrangement he had made with others.

The transaction with Thomas J. Plumer about which so much is said amounts to simply this :   The plaintiff had already invested so much he was reluctant about redeeming the premises, and consented to give T. J. Plumer and others an interest in the land provided they would give him security for the sum to be tendered to French.   As it is impossible for any one man to contend with this corporation, if it is unlawful for two or three to combine against them, then they will be likely to have their own way in the future as they have done in the past.

It is said the company has gained a prescriptive right to keep the water on the land in controversy.   A corporation, which, without pretence of right, takes possession of land of individuals and uses it twenty years, without interference, because it requires a fortune to contend with them, should not talk about a claim against them (if it is legal) being inequitable.

If the company has gained this right by prescription, then to give the plaintiff a deed of the land in controversy cannot deprive them of any rights.

The deed from Jacob Rowell to the company could only convey such rights as Rowell had. John Davis, 2d, their agent, when the deed was procured, understood what Rowell's title was or the defendants would have called him as a witness. It appears he now lives at Lake Village. See T. J. Plumer's deposition, 39. Plumer and wife allege that their own conduct was fraudulent in standing by and permitting the company to pay Rowell $10.00 ( ! ) without objecting, though neither of them knew what sort of a deed he gave, nor had any opportunity to object, and they did not then own but one half of the land.

But it is said that the land cannot be "located and defined." After the plaintiff gets the deed to which he is entitled it will be time to ascertain whether it can avail him. We ask for a deed in the words of the instrument. It is easy to prove to what extent the land *has* been flowed or injured whenever that becomes necessary. To that extent it certainly *could* be flowed or injured. It will not be difficult for the court to make a decree that will be satisfactory to the plaintiff and do no one any injustice. A line can be fixed whenever it becomes necessary which certainly will not embrace too much land.

*Stevens & Whipple,* for Plumers, French and Lake Company.

I. When Young took his lease from Plumer and wife, Aug. 25, 1851, the Lake Company had acquired the prescriptive right to flow any lands above Lake Village to the extent of the capacity of their dam.

II. The Lake Company likewise claim title under deed of Jacob Rowell to them of July 30, 1845, against which Plumer and wife are ʹ estopped from denying title, on account of their knowledge and conduct at the time of that transaction.

III. The description in the lease of Plumer and wife to Young, of Aug. 25, 1851, is so vague and indefinite, that no certain piece of land can be located by it. The same uncertainty appears in the deed tendered by the plaintiff to Plumer and wife for execution; and in this case the plaintiff nowhere informs the court what specific piece of land he claims to have conveyed to him. Furthermore, the deed tendered for execution was not drawn in accordance with the description contained in the lease.

IV. The plaintiff has not shown himself entitled to a conveyance, in this, that he has not paid the rents nor the consideration for a deed according to the stipulations of the lease.

V. The deed of Young to the plaintiff of Feb. 22, 1854, purporting to be an absolute conveyance, was by a secret understanding between the parties to be a mere security for money loaned. Young was then and ever after insolvent and a debtor to the Lake Company.

VI. But the plaintiff himself abandoned the conveyance of Feb. 22,

1854, from Young, by taking from the same party a mortgage of the premises covered by the prior deed to secure the purchase money constituting the consideration of that pretended conveyance. This mortgage was made by Young to the plaintiff, April 30, 1860, and the right of Young to redeem the same was conveyed to the plaintiff April 18, 1861.

VII. Now this corporation stands on the record by the conveyances from Plumer and wife, of Aug. 12, and 15, 1859, with absolute title to a definite parcel of land on the Rowell shore, marked by metes and bounds.

VIII. The lease from Young to Worster, of Oct. 2, 1851, was not an assignment of a right to demand title by deed. Therefore, if the Worsters had any interests sought to be enforced in these proceedings they were derived from the conveyance of the plaintiff to Sarah W. and Sarah J. Worster, of April 22, 1861.

IX. The Lake Company did not impair their title by the levy of their execution against Young, upon the premises attached Dec. 26, 1853. If the plaintiff held a valid mortgage, the company were entitled to the correct information in the records. The subsequent tender to French proceeded in the same wrong practiced in the records.

X. When Young procured the lease from Plumer and wife, he must be understood as taking it subject to the existing state of things. It must further be considered, since the purchase was inapplicable to any purpose of an agricultural character, that it was made for mechanical and manufacturing purposes, and if strictly so used now, neither Young nor his grantees can suffer damage on the Rowell shore, or complain of a perversion of their interests; besides a court of equity cannot lend itself to the mere speculative project of an individual and thereby sacrifice the paramount good of communities.

It is only claimed that Plumer and wife leased an undivided half of the flowage interests on the Rowell shore to be held in common with themselves; the lease was made with the water on the shore; neither Young nor his grantees can claim of a court of equity to remove it from Plumer's half now vested in the Lake Company.

These proceedings, and the incipient steps leading to them, result from a conspiracy and an unlawful combination of persons to the end of prosecuting the claim now set up for the purpose of extorting large sums of money from the Lake Company.

*I. A. Eastman,* for same defendants.

In examining the bill, answers and evidence, the inquiry throughout is constantly suggesting itself to the mind, What could have been the object of Young and Worster in procuring the lease from Plumer and wife? Everything standing or growing, or that could grow upon the

land, was reserved by Plumer. Young and Worster owned no rights below; they had no dam, no privilege, no land; nothing that could make the land or water, acquired by the lease, of the least possible value to them; and there was no use to which they could put the land or the water from which they could derive the first farthing of income. What, then, was their object? Plainly and unmistakably to harrass the company, to injure its property and to obtain money from it by extortion.

And what was the purpose of the plaintiff? Evidently to assist Young and Worster to accomplish their ends. He was cognizant of all that had been done. Throughout the whole proceedings, deep hostility to the company, a desire and determination to injure it, and the hope to make money out of its necessities, have been the motives that actuated and governed the plaintiff and his associates. The whole matter is too patent to escape the most cursory observation.

Being thus far foiled in their endeavors, they now come into court and appeal to its *equity* powers to aid them. And we submit that the court should not grant them any assistance in the matter, but, on the contrary, should put the stamp of condemnation upon their action and dismiss the bill.

1. It is an elementary principle that courts of equity will not lend their aid in carrying out any unjust, illegal or inequitable scheme. "He who seeks equity must come into court with clean hands." 1 Fonbl. Eq., B. 1, ch. 16, sec. 25; 1 Story's Com. sec. 59; *Swett* v. *Poor*, 11 Mass. 554; *Belknap* v. *Trimble*, 3 Paige Ch. Rep. 577.

2. The transaction was champertous. 4 Bl. Com. 135; 1 Hawk. ch. 84, sec. 81; Co. Litt. 368, b.; *Arden & als.* v. *Patterson*, 5 Johns. Ch. Rep. 44; *Brown* v. *Beauchamp*, 5 Mon. 413; *Morrison* v. *Deadrick*, 10 Humphrey 342; *Jackson* v. *Andrews*, 7 Wendell. 152; *Strachan* v. *Brander*, 1 Eden 303; *Wood* v. *Downs*, 18 Vesey 120.

It makes no difference who are the parties to a champertous transaction, whether counsel or others. *Holloway* v. *Low*, 7 Porter 488; *Barnes* v. *Strong*, 1 Jones Eq. 100; *Lathrop* v. *The Bank*, 9 Met. 492.

If it appear to the court that a suit in its inception or progress is in any way infected by champerty, it is the duty of the court to dismiss it. *Webb* v. *Armstrong*, 5 Humph. 379; *Swett* v. *Poor*, 11 Mass. 549, 553, 554; *Thompson* v. *Warren*, 8 B. Monroe 488.

3. The acts of the plaintiff and his associates, in endeavoring to get possession of the property, alleged to have been leased, for the injury of the company, amount to a conspiracy and render them liable accordingly; for a conspiracy consists not only in an unlawful combination or confederacy of two or more persons to do an unlawful act, but where the acts are in form lawful, but the *purpose* is *unlawful*, an indictment will lie. And if an indictment can be maintained, then surely no action can be sustained by them, or either of them, to carry out their iniquitous designs. *King* v. *Edwards & als.*, 8 Mod. 320; *King* v. *Robinson*, 1 Leach C. C. 47; 2 East. P. C. 823; 3 Ch. Cr. Law

1139; *Vertue* v. *Lord Clive*, 4 Burr. 2472; *State* v. *Buchanan*, 5
Har. & J. 317; *The People* v. *Richards*, 1 Mann. 216; *Com.* v.
*Judd*, 2 Mass. 329, 337; *King* v. *Journeymen Tailors*, 8 Mod. 11.
And such is the recognized law in this State. *State* v. *Burnham*, 15
N. H. 396, and authorities there cited.

A combination to injure the property of another is an indictable of-
fence; as much so as to injure his person. *King* v. *DeBerenger*, 3
M. & S. 67; *State* v. *Hewitt*, 31 Maine 396; *Eason* v. *Westbrook*,
2 Murphy 329; *State* v. *Shooter*, 8 Rich. 72; *Sheple* v. *Page*, 12
Vermont 519.

And this transaction was a combination to diminish the value of the
company's property, and to compel them to pay a large sum of money
to prevent it.

The foregoing, as it appears to me, is a true state of the case in its
general aspect, without entering into any discussion of the many *valid*
grounds of defense so well and ably presented by my associates; and I
submit, that, upon the ground of sound morals and public policy alone,
were there no other, this bill ought at once to be dismissed.

SARGENT, J. This is a bill for specific performance of the contract
contained in the lease from James H. Plumer and Abby P. Plumer, his
wife, to George W. Young, dated August 25, 1851, in which the court
is asked to decree that said Plumer and wife shall execute to this plain-
tiff as the assignee and representative of said Young, the deed stipulat-
ed for in said case, and that said French, the Lake Company, and oth-
ers, be enjoined from claiming said premises.

It may conduce to a better understanding of this case, to state first
in chronological order, the several facts that are either admitted or
proved, which are relied on by one side or the other, as material in
making out their case.

1. *Will* of Moses Rowell, dated May 25, 1840, approved and al-
lowed March 1, 1841, in which he devised his homestead farm in Gil-
ford, to his two sons, Jacob and Philip Rowell, for life, with remain-
der over to the heirs of Jacob and Philip forever.

2. *Deed*, Jacob Rowell to Lake Company, July 30, 1845. War-
rantee deed of all land on the Rowell farm that has been or may be
flowed by the Lake Company's dam, or any other dam of the same
height, also releasing all claims for past damages.

3. *Jacob Rowell died* June 4, 1851.

4. *Deeds*, between J. H. Plumer and wife, and Ayers and wife, Au-
gust 20, 1851. Jacob Rowell had two daughters, one of whom, Abby
P., married James H. Plumer in 1843, and the other had married one
Ayers. These were deeds of partition in which said Plumers obtained
title to all that part of said farm bordering upon Long Bay. It appears
that said Young and Worster, immediately after Jacob Rowell died,
were seeking to obtain some rights in this land which might be flowed
by the waters of said bay, and they counselled and advised said Plum-
ers in relation to the partition, so that they might obtain this flowage,

with an arrangement that said Young and Worster were to have some interest in it.

5. *Lease*, James H. Plumer and wife, to George W. Young, dated August 25, 1851, of one half the right of flowage on said farm; which lease also contained a bond to convey by deed the same premises to Young, his heirs, &c., when he should pay his note of even date for the sum of $320. This note was in a few days exchanged for another of the same date and amount, payable to one Roby, and signed by said Young as principal, and by said Plumer and another as sureties, which note was soon after sold and delivered by said Roby to James Bell.

6. *Lease*, George W. Young to James Worster, dated October 2, 1851, of one half of said Young's interest, being one fourth part of the flowage on said farm.

7. *Lease*, James Worster to Susan M. Worster, dated April 19, 1853, of the same premises, conveyed to him by Young.

8. *Attachment*, on writ, *Lake Co.* v. *said Young*, Dec. 28, 1853, of all Young's interest in said premises.

9. *Deed*, George W. Young to Thomas Eastman, dated Feb. 28, 1854, of all said Young's right (being one fourth part) in the said flowage. The consideration of this deed was that Eastman loaned to Young the money to pay this note of Young's to Bell, for $320, after which Eastman kept this deed as security, and also kept the note which Young had paid to Bell.

10. *Suit.* Writ entered February Term, 1854. Thomas Eastman sued Plumer on the note he had signed with Young to Roby, and which Young had paid to Bell. At trial, questions of law were reserved which were decided at December Law Term, 1855, and judgment ordered for the defendant. Judgment entered at the February Trial Term, 1856. See *Eastman* v. *Plumer*, 32 N. H. 238.

11. *Demand for a Deed*, by Eastman upon Plumer and wife, Dec. 29, 1855, immediately after the decision of case *Eastman* v. *Plumer*, in the Law Term, where it was decided that Eastman could not recover upon the note against Plumer, which Young had paid to Bell.

12. *Deeds*, James H. Plumer and wife to Lake Company, of the whole land upon the shore of Long Bay, on the Rowell farm, that may be flowed by the company's dam, dated Aug. 11, and 15, 1859.

13. *Lease*, Thomas Eastman to George W. Young, dated July 23, 1859, of all said Eastman's right in said flowage for 60 days, and this lease was extended to December, 1859, for the purpose of enabling Young to enter upon the company's dam, to destroy the same, which he did in conjunction with Worster and others, Sept. 28, 1859.

14. *Sale on Execution*, April 30, 1860, of Young's right in the premises in question by the Lake Company, as attached Dec. 28, 1853, which right was purchased by French, as agent, for the Lake Company.

15. *Mortgage*, George W. Young to Thomas Eastman, April 30, 1860, of Young's homestead, and also his interest in the flowage in question, to secure the $320 note, above described, dated August 25, 1851, and also two other notes of even date with the mortgage, one for $100, given, as Eastman says, for the costs which he incurred in his

suit against Plumer, and the other for $450, for money furnished Young to buy in the premises in question, at the sheriff's sale, on the Lake Company's execution, but as Young did not succeed in making the purchase, this money was returned to Eastman.

16. *Will* of Susan M. Worster, approved Feb. 26, 1861, giving her lands to her mother, Sarah W., and to her sister, Sarah J. Worster, in fee.

17. *Deed*, George W. Young to Thomas Eastman, dated April 18, 1861, of all said Young's right to redeem the premises in question from the mortgage of April 30, 1860.

18. *Deed*, Thomas Eastman to Sarah W. and Sarah J. Worster, April 22, 1861, of the same premises Young had previously deeded to James Worster, Oct. 2, 1851; this deed to be void, should said deed of Oct. 2, 1851, prove valid.

19. *Deed*, James, Sarah W. and Sarah J. Worster, to Thomas Eastman, April 23, 1861, of the same premises, conveyed to said James by said Young, and to said Sarah W. and Sarah J. by Eastman.

20. *Demand for a Deed*, by Eastman of Plumer and wife, April 26, 1862, according to conditions of bond contained in lease of August 25, 1851.

21. *Tender*, May 6, 1862, made by James Worster, for Thomas Eastman, to French, of the amount of money paid with interest, by French, for Young's interest in the premises in question, at sale on execution. In order to secure the money tendered to French, Eastman, in concert with Worster and Young, sold out certain rights in the premises in question, to certain individuals, and took their notes, which were to be void if said Eastman did not redeem from French, but if he did redeem, the notes were to be paid, and the persons paying were to own certain shares of the rights of flowage above mentioned, and were to participate in the profits of the concern *pro rata*.

22. Thereupon this bill for specific performance of the contract contained in the lease to Young of August 25, 1851, was brought and entered in court, June Term, 1862.

Having thus collected the facts that are material in the case, and arranged them, with such explanations as seemed necessary in order to their correct understanding, it may be well next to examine the law upon this subject of specific performance of contracts, and see what principles have been laid down and established for our guidance.

The granting of a specific performance of a contract for the sale of land, or other contract, is not a matter of right to which the party is entitled when he has proved his contract, but is always a matter of sound and reasonable discretion on the part of the court, in the exercise of which discretion it grants or withholds relief according to the circumstances of each particular case.

It is not a case requiring the aid of the court *ex debito justitiae*. It is a settled principle that a specific performance of a contract of sale is not a matter of course, but rests entirely in the discretion of the court upon a view of all the circumstances; and, in exercising this sound dis-

cretion, the court will not decree a specific performance in cases of fraud or mistake, or of a hard and unreasonable bargain, or in case of great inadequacy or exorbitancy of price, or when the decree would in any way produce injustice; and a defendant will generally succeed in procuring a dismissal of a bill for specific performance if he can convince the court that the exercise of their discretion in granting the prayer of the bill, would be inequitable under the circumstances of his case. *Woollam* v. *Hearn*, 7 Ves. 211; S: C. 2 Lead. Ca. Eq. *404; *Matthews* v. *Terwillager*, 3 Barb. S. C. R. 50; 1 Story's Eq. Juris. sec. 769; *Western Railroad* v. *Babcock*, 6 Met. 346, 352; *Seymour* v. *Delancy*, 6 Johns. Ch. 222, and cases cited; *King* v. *Hamilton*, 4 Peters 311, 328; *Canterbury Aqueduct Co.* v. *Ensworth*, 22 Conn. 608; *Rogers* v. *Saunders*, 16 Me. 92; *Toby* v. *Bristol*, 3 Story 800.

Those who desire to secure the aid of equity in enforcing the performance of contracts, must show themselves prompt, ready and eager to perform them and abide by them. So, when either party to a contract of sale fails or refuses to claim or act under the contract, for such a length of time as to give the impression that he has waived or abandoned the sale or purchase, and more especially when the circumstances justify the belief that his intention was to perform the contract only in case it suited his interest, he will necessarily forfeit all claim to equity. *Schmidt* v. *Livingston*, 3 Edwards 213; *Williams* v. *Starke*, 2 B. Mon. 196; *DeCordova* v. *Smith*, 9 Texas 129; *Mann* v. *Dunn*, 2 Ohio N. S. 187.

There are many cases in which the circumstances are such as properly to induce a court of equity to refuse to decree a specific performance of a private contract of sale of land, and to leave the party to his remedy at law, where they would not be sufficient to warrant it in setting aside the contract of sale. Inadequacy of price is one such cause. *Seymour* v. *Delancy*, 6 Johns. Ch. 232. So of many other equitable considerations not amounting to any illegality or actual fraud in the contract. Unless it appear that the party seeking a specific execution of an agreement has acted not only fairly, but in a manner clear of all suspicion, equity will not interfere; for if there be a reasonable doubt on the transaction, the party will be left to his legal remedy for non-performance of the contract. *O'Rourke* v. *Percival*, 2 B. & B. (Ball & Beatty) 58.

In 1814, the Grand Canal Company created certain stock with peculiar advantages to the subscribers, the legality of which was doubtful. In 1831, they empowered the board of directors to exchange for new stock such stock of 1814, as the holders thereof were willing to bring in upon certain terms. The plaintiffs, one of whom was a director and the other a stockholder, and both subscribers to the stock of 1814, refused to accede to the terms offered by the resolution of 1831, and afterwards filed a bill for a specific performance of the terms of the resolution of 1814, which relief was refused them, they having so acted that by their conduct they might have induced other stockholders of

1814 to accept of the arrangement proposed by the resolution of 1831. *Corballis* v. *Grand Canal Co.*, 3 Ir. Eq. R. 29.

'There are few cases in which courts of equity will insist on the maxim that he who seeks equity must do equity, with more rigor than in those of suits for specific performance.

Such being the law applicable to this class of cases, let us apply these principles of law to the evidence in this case on a few points.

. We are satisfied upon the evidence that Plumer and wife were not estopped to convey this land upon the shore of the bay, or this right of flowage, by any knowledge they had of, or by any part which they took in, or any assent they gave to, the conveyance of Jacob Rowell to the Lake Company, of the same rights, and although his was a warrantee deed, yet all that it conveyed was his interest, which was only a life estate, and at his death the whole property descended to his children and heirs.

Jacob Rowell died June 4, 1851. Immediately after his death negotiations were commenced by Young and Worster, to obtain a right in the shore upon Long Bay, on the Jacob Rowell farm. They counselled and assisted Plumer and his wife in getting a division of the farm with Ayers and wife, in such a way as to give Plumer all the shore on the bay. Then a certain right is leased to Young as follows : "One undivided half in common with said Plumers, of all the land on that part of the farm formerly occupied by Jacob Rowell, deceased, situate in the town of Gilford, aforesaid, which is or can be overflowed or in any way injured by the waters of the bay adjoining said farm, as it is now or can be raised and kept up by the dam situated at Lake Village, so called, and owned by the Winnipisseogee Lake Cotton and Woollen Manufacturing Company, or any other dam not exceeding the height of said dam." Said indenture also contained a bond to convey the same premises to Young by good warrantee deed upon his paying $320, for which he then gave his note.

The evidence tends to show that this shore thus flowed by the dam is utterly valueless to any person for any purpose whatever, unless it be to Plumer, the owner of the land adjoining, or to the Lake Company, for the purpose of flowage, except as a means to compel the Lake Company to lower their dam, or pay exorbitant damages for this right.

The purposes and objects of the parties appear in the evidence. Plumer testifies that Young said he wanted to buy one half of the flowage on the Rowell farm; that he said one half the flowage would be worth just as much to him as the whole of it. Plumer spoke of having a talk with Mr. Bell about selling the flowage to him. Young said if he undertook to sell to Bell it would not amount to much, but that if he would lease it to Young, or let him and Worster manage it, he could have any amount of money he was a mind to ask; that the company dreaded Worster more than any other man; that if Plumer would trade with them, they would manage the thing free of costs to Plumer, and when the company was ready to settle with them, they would not settle with the company until the company would settle with Plumer and pay him his price. He said if Plumer would sell to him, they would see

that his claim did not outlaw.   Young said the plan was that they were to go right on and take down the dam, and take the  water off down to where the company had a right to keep it, unless they would settle with him ; this was to be done right off, and Plumer was to have his money ; he was to have what he asked for his right if it was $40,000.

Worster says : "Young and I had many talks with Plumer as to how the business should be managed to get the whole interest into Plumer's hands, or his wife's, and we advised him how to  proceed in order to do this, with the understanding that Plumer would convey to Young or to Young and her, one half of the whole interest in the land flowed or injured by the dam as it then was, or any other dam of the  same height. After Plumer had  got  the  whole  interest in him and  his wife, it was agreed to convey to Young.   Plumer desired to give him a deed, which Young was disposed to take, but I advised a lease and a bond to convey ; Young gave his note, &c., and, when it was paid, Plumer was to deed."   He further says : "We intended to convince the Lake Company that they could afford to pay us more for the land than we paid Plumer for it.   Our object in procuring the lease  was to sell  it to the Lake Company for such price as we saw fit to sell it for.   Thought they could afford to pay liberally, but did not fix  upon any sum.   Should have been glad to have made them believe they could  afford to pay $50,000 or more for it."

We are satisfied, from all the testimony, that the  whole arrangement was got up and entered into by the Plumers, with Young and Worster, upon the suggestion and advice of Worster, who has been from the beginning, and is still equitably interested as a party  in all  the  transactions connected with this property here in question  since  the death of  Jacob Rowell.

The conveyance from Worster to his daughter was simply to keep the property away from his creditors, and was in fact without any real consideration.   So the conveyance from said Worster and wife and daughter, just before this suit was commenced, to this plaintiff, was simply a matter of form, and without consideration ; Eastman giving them a writing at the time of the conveyance, that he would hold  such interest in trust for them, and he is to reconvey to them, after this suit is terminated, a similar interest.   Eastman and Young and Worster have acted in concert ever since Young conveyed to Eastman.   In fact, the latter has been holding  these rights and acting as the representative of Young and Worster ever since he took his deed, with full knowledge of what had been done before that, so that he can stand in  no better position than either Young or Worster would do if they were either of them plaintiffs in this bill.

When an attempt was to  be made by  force to  tear down the Lake Company's dam, Eastman leased to Young these premises for sixty days, and Young made the  attack on  the dam openly, while Worster, who had been enjoined by the court  from intermeddling  with  the dam, was the adviser and the ringleader in the plot, the soul of the whole enterprise, and yet attempting to move in  secret, and to keep his agency in the matter hid from view ; in which attempt he was not very successful,

however, any more than all these parties were in their attempt to destroy the dam.

The purpose and object of Worster and Young and Eastman, from their first agency in this business, has been to compel the Lake Company in some way, either by tearing down their dam, or by the institution of suits, to pay them an exorbitant price for this right of flowage, and this suit is only another attempt to accomplish the same purpose. The Plumers are not entitled to any particular favor in this matter, as will be seen from the statements of the case, they having entered into the arrangement with the same motives originally, and for the same purpose, as did the other parties. Neither could the Lake Company stand here to object to the prayer of this bill, relying upon their deeds from the Plumers only, as those conveyances were obtained with a full knowledge of the previous existence of the lease and bond for a deed from the Plumers to Young, of the premises in controversy.

Now, we need not here stop to inquire whether the transactions between any of the parties in this case amount to champerty or maintenance, or whether the arrangements made between Worster, Young and Eastman, either with or without the Plumers, amount in law technically to a conspiracy to extort money from the Lake Company, though it evidently looks something like it. But suppose that technically it amounts to neither of these, and still this is evidently not a contract that has any special claims upon equity to decree a specific performance, for the express purpose of enabling this plaintiff and his associates to fleece the Lake Company according to their original design.

We find that Young's interest in the premises was attached by the Lake Company before he conveyed to Eastman. The fact of this attachment was not probably known to Young or Eastman at the time Eastman furnished Young the money to pay his note to Bell, and took the conveyance from Young, which was done at that time merely as a matter of security. But when it was ascertained that Young's interest was attached before the conveyance to Eastman, then it seemed to be for the mutual interest of both Young and Eastman, to rescind the contract made with the Plumers, and to recover back of Plumer the money paid by Young on his note ; and it seems that both Eastman and Young chose and elected to rescind the contract, and brought a suit against Plumer, upon the note which Young had given for the $320, and which Plumer had signed as surety for Young to Roby, for the purpose of recovering back the money that Young or Eastman had paid for this right of flowage, or for the land that was or might be flowed. This suit was in court nearly two years after Eastman and Young and Worster had all concluded to rescind the contract for a deed, by seeking to recover back the money that had been paid on that contract and for the deed, but it was finally decided at the law term of said court, that the payment by Young of the money to Bell, was a payment of the note, and discharged the surety. *Eastman* v. *Plumer, 32 N. H. supra.*

During the pendency of this suit, we hear nothing said about demanding a deed from Plumer. It was, of course, understood that they could not have both the deed and the money that had been paid as the

consideration for the deed, and while they thought they could recover back the money, nothing was said about the deed; that was abandoned. But as soon as it was decided that the money could not be recovered back of Plumer in that suit, then a demand is made on Plumer for a deed in December, 1855, the same month and immediately after the decision of the questions in the Law Term.

But there the matter seems to have rested from December, 1855, to April 26, 1862, six years and five months, and no motion was made by plaintiff to secure his rights. Why this long delay? It seemed but just perhaps to wait till the suit against Young should be disposed of. And hence when Young's right had been sold on execution, and within the year, a new arrangement had been made of parcelling out shares or stock in the concern, and selling it to others so as to secure the repayment of the money to be advanced as a tender to redeem said right, we find it tendered to French by Worster for Eastman. And thereupon the demand for a deed was renewed, which would not probably have been the fact, if Young's right as sold on execution had not been redeemed.

Suppose that Plumer has been in fault, and has sometimes wished to carry out this contract and at others to rescind it, the same has been equally true of the plaintiff, and if both are equally in fault, the plaintiff cannot proceed in this proceeding. When the contract was first made all parties agree that the Plumers were willing to give the deed, and proposed to do so, and Young was about to take it, but Worster, thinking that some sort of circumlocution would better accomplish his purposes than straight-forward plain dealing, had it arranged as it was, a deed to be given when the $320 note was paid.

But when the $320 note was paid, Eastman and Young and Worster all arranged it not to call for a deed, but all set themselves at work to rescind the contract, as far as it could be done on their part, and instead of demanding a deed, sought to recover back of Plumer the money paid by Young, which could only be done by rescinding the contract for a deed, so far as it was in their power to do so. Pursuing this plan of operations for about two years, and failing, a deed was forthwith demanded; but then there followed a delay of some six years and a half, during which nothing was done or said about the deed, but the effect of attacks upon the dam, and attempts to destroy it in September, 1859, were tried without marked success; and after the result of the suit against Young in favor of the Lake Company was ascertained, a new demand for a deed was made, and this suit was brought to compel the specific performance of a contract, which they had elected to rescind, and had sought, for nearly two years, to repudiate and get rid of; the plaintiff and his associates in interest having changed their positions as interest seemed to dictate. We do not think the plaintiff, under these circumstances, is in a position to invoke successfully the aid of a court of equity in compelling the other party to perform a contract, which he himself has chosen to rescind, and has so strenuously sought to repudiate.

Applying to these facts the principles of law before stated, it would

seem entirely clear, without considering the numerous other questions raised by the arguments in this case, that this bill must be dismissed, not so much on account of any strong equities existing on the side of the defendants, as of the entire want of equity in the case made by the plaintiff, who must thus be left to his remedy at law, if he has any, to recover damages for the non-performance of his contract.

*Bill dismissed with costs.*