## WOLF, RESPONDENT, v. GREAT FALLS WATER POWER AND TOWNSITE COMPANY ET AL., APPELLANTS.

[Submitted February 24, 1893. Decided October 22, 1894.]

PRACTICE—*Entry of judgment—Dismissal.*—A judgment rendered and entered, but entered by the clerk in the "Minute-book," instead of the book labeled "Judgment by the court," is not invalid on that account, especially between the parties, so as to require an appeal therefrom to be dismissed.

SAME—*Appeal—Insufficient ground for dismissal.*—The trial court amended its judgment on motion of the defendant to correct certain defects therein. An appeal was taken by the defendant from the original judgment, and also from the order of the court denying his motion for a new trial. *Held,* that as this appeal brought the whole case before the court, it should not be dismissed on the ground that it should have been taken from the amended judgment, but had it been from the original judgment alone the rule might be otherwise.

EQUITY—*Specific performance—Laches.*—A party suing for the specific performance of a contract in a court of equity must show that he has been ready, desirous, prompt, and eager in complying with his part of the contract, or in filing his bill and prosecuting his suit for relief, in case of failure or refusal to fulfill on the part of his adversary, or show good and sufficient reason for his delay in so doing. And where the plaintiff waited for three and a half years after his cause of action accrued, before he brought suit, and offered no excuse for this delay, he must be deemed guilty of such laches as to debar him of equitable relief.

SAME—*Laches—Statute of limitations.*—Although a party brings his suit within the period prescribed by the statute of limitations, he may yet be guilty of such laches as will debar his right to relief in strictly equity cases, as in a suit for the specific performance of a contract. (HARWOOD, J., dissenting.)

*Appeal from Eighth Judicial District, Cascade County.*

ACTION for the specific performance of a contract.  Judgment was rendered for the plaintiff below by BENTON, J.

Reversed.

Statement of the facts prepared by the Justice delivering the opinion:

On the twenty-second day of January, 1887, the plaintiff and James J. Hill and Conrad Gotzian, and their wives, entered into the following agreement:

"ARTICLES OF AGREEMENT made this 22nd day of January, in the year of our Lord one thousand eight hundred and eighty-seven, between James J. Hill and Mary T. Hill, his wife, Conrad Gotzian and Caroline Gotzian, his wife, by Charles H. Benedict, their attorney in fact, all of the city of St. Paul, county of Ramsey, and state of Minnesota, all parties of the first part, and Jeremiah Wolf, of Great Falls, county of Choteau, territory of Montana, party of the second part, *witnesseth*, that the said parties of the first part hereby covenant and agree that if the party of the second part shall first make the payments and perform the covenants hereinafter mentioned, on his part to be made and performed, the parties of the first part will convey and assure to the party of the second part, in fee simple, clear of all encumbrance whatever, by a good and sufficient warranty deed, the following lot, piece, or parcel of ground, situate, lying, and being in the town of Great Falls, in the county of Choteau, territory of Montana, and more particularly described, according to the plat thereof on file in the office of the recorder in and for said Choteau county, as follows, to wit: Lot one (1) in block four hundred and eleven (411). It is hereby mutually understood and agreed that the above premises are sold to said second party for improvement, and the said party of the second part agrees and obligates himself, heirs, and assigns that he or they will, on or before the first day of August, 1887, build and construct a frame building, of the value of not less than five hundred dollars ($500), and that all improvements placed on said premises shall remain thereon, and shall not be removed until final payment of the considera-

tion hereinafter named.  And the said party of the second part, in consideration of the premises, hereby covenants and agrees to pay to the said parties of the first part the sum of three hundred and fifty dollars ($350), lawful money of the United States, in the manner following: Eighty-seven and $\frac{50}{100}$ dollars ($87.50) on the execution of this contract; eighty-seven and $\frac{50}{100}$ dollars ($87.50) on the 22nd day of April, 1887; eighty-seven and $\frac{50}{100}$ dollars ($87.50) on the 22nd day of July, 1887; eighty-seven and $\frac{50}{100}$ dollars ($87.50) on the 22nd day of October, 1887—with interest at the rate of ten per cent per annum, payable semi-annually, on the whole sum remaining from time to time unpaid, and to pay all taxes, assessments, or impositions that may be legally levied or imposed upon said land subsequent to the year 1886.  And in case of the failure of the said party of the second part to make either of the payments, or perform any of the covenants on his part hereby made and entered into, this contract shall, at the option of the parties of the first part, be forfeited and determined, and the party of the second part shall forfeit all payments made by him on this contract; and such payment shall be retained by said parties of the first part in full satisfaction and liquidation of all damages by them sustained, and they shall have the right to re-enter and take possession of the premises aforesaid.  It is mutually agreed that all the covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, and administrators and assigns of the respective parties.  In witness whereof the parties to these presents have hereunto set their hands and seals the day and year first above written.

"JAMES J. HILL and MARY T. HILL, his wife,
"By Their Attorney in Fact, CHAS. H. BENEDICT.
"CONRAD GOTZIAN and CAROLINE GOTZIAN, his wife,
"By Their Attorney in Fact, CHAS. H. BENEDICT.
                                        "JEREMIAH WOLF.
"Signed, sealed, and delivered in the presence of
                                        "Eugene P. Hickey,
                                        "William A. Stephens."

Afterward, the lot in controversy, with a large tract of other lands, was sold to the defendant company, which assumed

to carry out and perform the above agreement with the plaintiff. The evidence shows, and the court finds, that the plaintiff made but one payment on the lot in controversy during the time fixed for the payments thereof, on said agreement; that he failed to pay the taxes thereon before commencing this suit, amounting to sixty dollars, which the defendant company paid; that he failed to complete the house on the lot, according to the terms of the agreement, but, instead, erected a house, which he did not complete, of the value of about three hundred and thirty dollars. The plaintiff entered upon the premises in controversy at the time of the execution of said agreement, and occupied them until September or October of the same year, when he moved to his ranch. The court finds that the plaintiff on the twenty-second day of October, 1887, tendered the residue of the purchase money, and interest, which he had failed to pay at the times specified therefor in said agreement, which the defendant company refused to accept. After the plaintiff left the premises the defendant company took possession, finished the house which plaintiff erected thereon, fenced in the same, and planted trees thereon, and has ever since held the possession thereof, declaring said agreement forfeited. On the twenty-ninth day of April, 1891, the plaintiff commenced this suit for a specific performance of the contract of sale of the said lot in accordance with the terms of said agreement. The case was tried by the court without a jury. The court made a good many findings of fact, including the facts set out in the above statement. Among other findings of fact by the court we have the following: "16. That at the time of entering into the contract for the sale of the lot in controversy the vendors, Hill and Gotzian, were the owners of a large amount of land in the neighborhood of said lot, which they had platted, and a part of which, being six in every fourteen lots, they were engaged in selling on contracts similar to the one made with plaintiff. 17. That the object and purpose of such vendors in such contract, requiring the purchaser to erect a building, was to secure an increase in the value of the property contiguous thereto. 18. That the plaintiff knew at the time of entering into the contract herein of the ownership by the vendors of the neighboring property.

19. That the erection of a building upon the lot in controversy would tend to advance the market value of the neighboring property owned by the vendors.   20. That, at the time such contract was declared forfeited by the defendant Paris Gibson, the building erected upon such lot by the plaintiff was incomplete, in this: that it was without siding or corner boards, and that such building was the only improvement made thereon by the plaintiff." The court, upon the findings of fact, rendered judgment for the plaintiff, for specific performance, upon his paying to the defendants the sums due them, according to the terms of said agreement. The defendants filed their motion for a new trial. This was denied, and from the order of the court refusing a new trial, as well as the judgment, this appeal is prosecuted.

*A. J. Shores,* for Appellants.

Time may be made of the essence of a contract by express stipulation, or it may arise by implication from the nature of the property, or the avowed objects of the seller or the purchaser. (*Taylor* v. *Longworth,* 14 Pet. 175; *Green* v. *Covillaud,* 10 Cal. 328; 70 Am. Dec. 725; *Martin* v. *Morgan,* 87 Cal. 203; 22 Am. St. Rep. 240; *Tilley* v. *Thomas,* L. R. 3 Ch. 61; *Haggerty* v. *Elyton Land Co.,* 89 Ala. 428.) Although the plaintiff had alleged and proved a sufficient excuse for his failure to perform within the time named he could not maintain this action because of his laches in filing his complaint. (Fry on Specific Performance, 730–37; *Delavan* v. *Duncan,* 49 N. Y. 490; *Knox* v. *Spratt,* 23 Fla. 64.)

*Ed L. Bishop,* for Respondent.

Whether time was of the essence of the contract depended wholly upon the intention of the parties, and the court rightly found that it was not the intention of the parties that time should be of the essence of this contract. (Wateman on Specific Performance, §§ 519, 548; *Steele* v. *Branch,* 40 Cal. 11; *Heinlen* v. *Martin,* 53 Cal. 344; *Matthews* v. *Gillis,* 1 Clark, 242; *Benson* v. *Tilton,* 24 How. Pr. 494.) The finding of the court will not be disturbed where there is any evidence tending to support it. (*Metropolitan Loan Assn.* v. *Meinecke,* 75 Cal.

513.)   Or "where the import of the evidence is in favor thereof, although meagre and obscure." (*Anderson* v. *Perkins*, 10 Mont. 154.)   It must affirmatively appear that the parties regarded time as an essential element in their agreement, or a court of equity will not so regard it. (*Miller* v. *Cox*, 96 Cal. 339; Waterman on Specific Performance, § 462.)   The defendant having allowed the plaintiff to go on and improve the property after he was in default, thereby waived his right to declare the contract forfeited.   (Waterman on Specific Performance, §§ 198, 637; *Farley* v. *Vaughn*, 11 Cal. 227; *Murphy* v. *Lockwood*, 21 Ill. 611; *Bellamy* v. *Ragsdale*, 14 B. Mon. 364; *Steele* v. *Brach*, 40 Cal. 13; *Cheney* v. *Libby*, 134 U. S. 68; *Miller* v. *Cox*, 96 Cal. 339; *Sylvester* v. *Born*, 132 Pa. St. 467; *Tibbs* v. *Morris*, 44 Barb. 138.)   Equity will relieve against a breach of condition where compensation can be made.   (Waterman on Specific Performance, §§ 435, 437, 468, 595.)   Where, from all the circumstances connected with an agreement for the sale of lands, it appears that time was not of the essence thereof, mere delay will not bar the petitioner's right to relief.   (*Smith* v. *Thompson*, 54 Am. Dec. 134, note.) A court of equity will not refuse its aid on the ground of lapse of time to one who has been continually in possession. (*Calmes* v. *Buck*, 4 Bibb, 453.)   And equity never enforces either a penalty or forfeiture.   (*Keller* v. *Lewis*, 53 Cal. 113.) The statute of limitations having run against an action by the respondent to recover the money paid and the value of the improvements, if he should be held not entitled to specific performance, the court will retain the action for the purpose of allowing him compensation.   (Waterman on Specific Performance, § 521; *Gerrat* v. *Howland*, 45 Barb. 560; *Allen* v. *Young*, 88 Ala. 338; *Combs* v. *Scott*, 76 Wis. 662; *Powell* v. *Higley*, 90 Ala. 103.)

*Baum & Bishop*, for Respondent, on motion to dismiss appeal.

The right of appeal attaches from the time of the entry of the judgment "in the judgment-book." (*Chester* v. *Bower*, 55 Cal. 46; *McLaughlin* v. *Doherty*, 54 Cal. 519; *Page* v. *Superior Court*, 76 Cal. 372; Hayne on New Trial, 549; Black

on Judgments, § 106; *Washburn* v. *Sharpe*, 15 Minn. 65.)
Appeal from modified or amended judgment. (*Mann* v.
*Haley*, 45 Cal. 63; *Bixby* v. *Bent*, 59 Cal. 532.) The only
questions which can be considered on appeal from the order
denying the defendant's motion for a new trial. (*Jenkins* v.
*Frink*, 30 Cal. 596; 89 Am. Dec. 134; *Shepard* v. *McNeil*, 38
Cal. 74; *Roberts* v. *Eldred*, 73 Cal. 394; *In re Doyle*, 73 Cal.
564, 571; *Martin* v. *Matfield*, 49 Cal. 45.) The defendant
could in no way be prejudiced by the language of the court in
its finding as to the "rental value" of the premises in question.
(*Swain* v. *Burnette*, 76 Cal. 299; *Heinlen* v. *Martin*, 53 Cal.
342.) The court will not reverse because an immaterial find-
ing is not sustained by the evidence. (*Buckley* v. *Althorf*, 86
Cal. 643.) When a court of equity will regard time as of the
essence of a contract. (Waterman on Specific Performance,
596; 6 Am. Dec. 663; 84 Am. Dec. 151; 10 U. S. 405; 3
U. S. 96; 5 U. S. 322; 7 U. S. 219; 15 U. S. 833.) Mere
delay, not amounting to abandonment, will not bar relief
where time is not of the essence of the contract. (54 Am.
Dec. 134, note.) In many cases specific performance will be
decreed on payment of the money notwithstanding delay.
(33 U. S. 819; 65 Am. Dec. 303; 40 Cal. 3, 13; 5 U. S. 324.)
Equity follows the law of the statute of limitations by analogy.
(*Dominguez* v. *Dominguez*, 7 Cal. 427; Angell on Limitations,
25; 58 Am. Dec. 142; 52 Am. Dec. 212; 50 Am. Dec. 253.)

PEMBERTON, C. J.—Upon the filing of the record of the
case in this court the respondent moved this court to dismiss
the appeal, upon the grounds that it appears that the judgment
of the court was not entered in the proper book. It appears
that the clerk of the lower court kept a book labeled "Judg-
ment by the Court," kept for the sole purpose of entering judg-
ments by the court, and that the judgment in this case was not
entered in this book, but it was entered in the "Minute Book"
of the court. It also appears from the record of the case that
the court, on the seventeenth day of October, 1891, made and
filed its findings, and decision, and judgment; that, on the
twenty-seventh day of October, defendant filed its notice of

intention to move for a new trial; that thereafter, on the fourth
day of November, defendant excepted to the findings of the
court, and moved the court to correct certain defects therein;
that on the eleventh day of November the court made and
filed an amended finding, decision, and judgment, giving the
defendant judgment for seventy-five dollars and thirty cents
more than by the original findings and judgment. And, as
the appeal is from the original judgment, the respondent con-
tends it should be dismissed. If this appeal were from the
judgment alone this last might be a serious question. But
the appeal is also taken from the order of the court denying
appellant's motion for a new trial, and, as this appeal brings
the whole case here, we do not think it should be dismissed for
the reasons assigned by respondent. It appears also that the
judgment of the court was rendered and entered, but entered
in the "Minute Book," instead of the book labeled "Judg-
ment by the Court." We do not think the judgment was
invalid, especially between these parties, on that account, or
that no appeal would lie therefrom.

There are a great many assignments of error in this record.
The appellant contends and urges that the evidence shows that
time was of the essence of the contract, and that the evidence
shows that the plaintiff failed to comply with its terms in
many material particulars, and has shown no excuse for not
complying, and is therefore not entitled to specific perform-
ance. The court found that time was not of the essence of
the contract. Whether the court erred in this finding or not—
whether time was of the essence of the contract, as shown by
the evidence and circumstances surrounding the case—we do
not deem it necessary to decide in determining this case, while
we confess that many of the facts and circumstances go far to
support the theory that time was considered as of the essence
of the contract by the parties at the time of its execution. At
least, we think it cannot be insisted, under all the facts and
circumstances, that time was not material. As we view it,
the vital question in the case is this: Was the plaintiff guilty
of such laches, under all the facts and circumstances, after
being notified by the defendant company that it would not ful-
fill its part of the contract, in bringing his suit, as to debar

him of equitable relief? "Specific performance is not an absolute right. It rests in judicial discretion, exercised according to the principles of equity, and with reference to the facts of the case." (4 Gen. Dig., U. S., 1710, and authorities cited. See, also, 2 Beach on Modern Equity Jurisprudence, § 566, and authorities cited.) In *Knox* v. *Spratt*, 23 Fla. 64, the court said: "The bill shows no reason for this long delay. Although time is not of the essence of this contract, yet, if the complainant is not active and diligent in the assertion of his claim, and permits an unreasonable time to elapse, it will be presumed that he has acquiesced, and has abandoned any equitable right he might have had to enforce the contract. In the case under consideration the complainant waited two years and seven months, and he shows no reason why he delayed so long to file his bill. In *Watson* v. *Reid*, 1 Russ. & M. 236, the plaintiff, who was the vendor, did not file his bill for specific performance until about one year afterward. The bill was dismissed on one ground that the plaintiff had unreasonably delayed filing it. In the case of *Gentry* v. *Rogers*, 40 Ala. 442, the plaintiff, though notified two years before the time for performance that the defendant would not perform the contract, waited nine months after the time when the contract should have been performed before filing his bill. 'In such cases, though time be not of the essence of the contract, a court of equity will not allow of a delay which would enable a party to take advantage of the turn of the market, and have the contract performed only in case it suits his interest.'" In *Delavan* v. *Duncan*, 49 N. Y. 485, the court say: "The contract was made November 6, 1862, for the sale of a house and lot in the city of New York for the price of five thousand five hundred dollars, to be paid on the 15th of the same month, or as soon thereafter as the title could be searched, not to exceed thirty days. The judge finds as facts that, early in December, 1862, about twenty days after making the agreement, the title to the property having been searched, the plaintiff said to the defendant that there were judgments recorded against him (describing such judgments), and requested him to have said liens removed, and stated that he was then ready to fulfill his agreement; that defendant said he could not or would not re-

move the liens.  The action was not commenced until August, 1866.  The inquiry is whether, upon these facts, the plaintiff was entitled to judgment for specific performance, and, if not, whether the evidence authorized the finding of such additional facts as would entitle him to such judgment.  Fry on Specific Performance, section 730, a work of acknowledged authority, says: 'The court of chancery was at one time inclined to neglect all consideration of time in the specific performance of contracts for sale, not only as an original ingredient in them, but as affecting them by way of laches.  But it is now clearly established that the delay of either party in not performing its terms on his part, or in not prosecuting his right to the interference of the court by filing a bill, or, lastly, in not diligently prosecuting his suit, when instituted, may constitute such laches as will disentitle him to the aid of the court, and so amount, for the purpose of specific performance, to an abandonment on his part of the contract.'  Section 731 refers to the cases in which this doctrine was established.  Section 732 says: 'The doctrine of the court thus established, therefore, is that laches on the part of the plaintiff, either in executing his part of the contract, or in applying to the court, will debar him from relief.'  'A party cannot call upon a court of equity for specific performance,' said Lord Alvanley, 'unless he has shown himself ready, desirous, prompt, and eager'; or, to use the language of Lord Cranworth, 'specific performance is relief which this court will not give, unless in cases where the parties seeking it come as promptly as the nature of the case will permit.'  The cases cited by the author fully sustain his conclusions.  (See, also, *Marquis of Hertford* v. *Boore*, 5 Ves. 719, and cases cited note b, p. 720; 1 Story's Equity Jurisprudence, §§ 771, 781.)  In *Taylor* v. *Longworth*, 14 Pet. 172, Judge Story, in giving the opinion of the court, at page 175, says: 'Relief will be given to a party who seeks it, if he has not been grossly negligent, and comes within a reasonable time, although he has not complied with the strict terms of the contract.  But in all such cases the court expects the party to make out a case free from all doubt, and to show that the relief which he asks is, under all the circumstances, equitable, and to account in a reasonable manner for his delay

and apparent omission of his duty.'" In *Gentry* v. *Rogers*, 40 Ala. 442, in a case very similar to the one at bar, the court say: "But there is another consideration which militates against the case of complainant. If one of two parties concerned in a contract respecting lands gives the other notice that he does not hold himself bound to perform, and will not perform, the contract between them, and the other contracting party, to whom the notice is so given, makes no prompt assertion of his right to enforce the contract, equity will consider him as acquiescing in the notice, and abandoning any equitable right he might have had to enforce the performance of the contract, and will leave the parties to their remedies and liabilities at law. (2 White and Tudor's Leading Cases in Equity, note to *Seton* v. *Slade*, pt. 2, p. 516; *Guest* v. *Homfray*, 5 Ves. 818; *Heaphy* v. *Hill*, 2 Sim. & St. 29; *Watson* v. *Reid*, 1 Russ. & M. 236; *Walker* v. *Jeffreys*, 1 Hare, 341.) Not deciding the question whether the rule thus laid down had application to the case of complainant before the time fixed for the complete performance of the contract, yet, with distinct and emphatic notice that the defendant would not hold himself bound to perform the contract between them, given two years before the period fixed for performance, he permitted about nine months to elapse from the latter period before he filed his bill to enforce performance; and this delay on his part is not accounted for, but left wholly unexplained. In *Watson* v. *Reid*, 1 Russ. & M. 236, the plaintiff, the vendor, having notice from the purchaser that the latter abandoned his contract, did not file his bill for specific performance until about one year afterward, and the bill was dismissed on the sole ground of unreasonable delay in filing it. In such cases, though time be not of the essence of the contract, a court of equity will not allow of a delay which would enable a party to take advantage of the turn of the market, and have the contract performed only in case it suits his interest. The complainant in the case before us, by the delay in filing his bill, and by his failure to perform the acts required of him by the contract, did not evince that promptness and eagerness for a performance required at his hands to entitle him to invoke the urgent powers of a court of chancery to compel performance."

In *Boston etc. R. R. Co.* v. *Bartlett*, 10 Gray, 384, in a case involving the law of laches, the court say: "The contract for the sale of the land was made in 1844. The plaintiffs performed their part of the contract on the 29th of May of the same year, and the defendants then distinctly and absolutely refused to perform it on their part. No bill was filed for more than three years after the final refusal of the defendants to perform the contract, and this long delay in applying for the enforcement of the contract is left by the plaintiffs entirely unexplained. These facts, of themselves, would make us hestitate to give the plaintiffs the equitable relief which they seek. (*Walker* v. *Jeffreys*, 1 Hare, 348, and cases cited; *Rogers* v. *Saunders*, 16 Me. 92; 33 Am. Dec. 635.) But there are other circumstances which tend to show that it would be inequitable to grant the relief asked for. The fact that the land which was the subject of the contract had greatly increased in value after the refusal to perform the contract, and before the filing of this bill, is entitled to some weight. (*Holt* v. *Rogers*, 8 Pet. 434.) . . . . Having thus, by their acts and laches for three years, induced the other party to suppose that they have abandoned this contract, it is too late to apply to this court to enforce it." In this case it will be observed that, although the plaintiff had promptly performed his part of the contract of sale, the court refused specific performance on account of the failure to bring suit therefor for the period of three years. In Waterman on the Specific Performance of Contracts, section 473, the rule is thus stated: "The doctrine is well settled that great delay of either party, unexplained, in performing the contract, or when he claims specific performance in filing his bill, or in prosecuting his suit after the bill is filed, constitutes such laches as to forbid the interference of a court of equity, and to amount to an abandonment of the contract on his part." (See, also, cases cited in note.) Mr. Pomeroy, in his work on Equity Jurisprudence, volume 3, section 1408, states the doctrine thus: "Although time is not ordinarily essential, yet it is, as a general rule, material. In order that a default may not defeat a party's remedy the delay which occasioned it must be explained and accounted for. The doctrine is fundamental that a party seeking the remedy

of specific performance, and also the party who desires to maintain an objection founded upon the other's laches, must show himself to have been 'ready, desirous, prompt, and eager.'"

In the case at bar the plaintiff not only failed, as the evidence shows, to strictly comply with his part of the contract of sale, although he had ample reason to presume, from the feeling existing between the parties in relation to the matter, that a strict compliance would be required, but, after being notified by the defendant company that it would not perform its part of the contract, after his tender of the purchase price of the lot was refused, and after the defendant company had re-entered and taken possession of the premises in controversy, he waited for more than three years before commencing his suit for specific performance. This delay is not explained, or in any way attempted to be explained, or excused. In fact, it seems that no excuse for this delay existed. The plaintiff in his testimony uses this language: " I had several thousand dollars last fall, and had at all times the ability to get money." The court finds that the object of the vendors in said contract, in requiring plaintiff to erect such a building on the lot, was to enhance the value of the property contiguous thereto, owned by defendant; that the erection of such a building thereon would have such effect; and that plaintiff was aware of these facts. The lot in controversy is situate in the city of Great Falls. At the time the contract was sought to be enforced, Great Falls was a small, struggling village. At the time of the commencement of this suit—more than three years after the expiration of the contract—it had grown to be a flourishing young city. Real estate had vastly increased in value, and its population had grown from hundreds into thousands. The circumstances and surroundings of the parties were different at the commencement of this suit from what they were at the date fixed for the completion of the contract sued on. Could the plaintiff lie by and wait for three years to see whether his contract was a good one, and, if so, ask a court of equity to enforce it, and, if a bad one, ignore and renounce it? We think not. The doctrine involved in this branch of the case is very elaborately discussed in *Green* v. *Covillaud,* 10

Cal. 317; 70 Am. Dec. 725. (And see authorities cited in this case.) In the case just cited the court say: "In · California, where such rapid and sudden fluctuations in the affairs and fortunes of men occurred as in all history is unexampled, and where the work of years was accomplished in months, it is impossible to hold that time, as an element of past contracts, should be measured by the standards which obtain in old and settled states, where every thing is comparatively stable and permanent; where capital is abundant, titles ascertained, and interest is low. The peculiar circumstances, showing the value of punctuality here, call for a corresponding rule, whereby the courts should exact it; and we conceive that it would be as unjust as impolitic and demoralizing to make new contracts for parties, by extending time they never intended to give, for it would be to encourage violation of engagements, and foster a spirit of reckless speculation."

We think it the well-settled doctrine that a party suing for a specific performance of contract, in a court of equity, must show that he has been "ready, desirous, prompt, and eager" in complying with his part of the contract, or in filing his bill and prosecuting his suit for relief, in case of failure or refusal to fulfill on the part of his adversary, or show good and sufficient reason for his delay in so doing. In this case the plaintiff has not done so. In failing to do so we think the plaintiff has been guilty of such laches as to debar him of the right to the relief sought. But it is contended that the statute of limitations controls in such cases, and that, as a consequence, the plaintiff would not be guilty of fatal laches, if he has brought this suit within the time prescribed by the statute of limitations. In 1 Beach on Modern Equity Jurisprudence, section 20, the rule is thus stated: "Ordinarily courts of equity adopt the time fixed by the statute of limitations in analogous cases as the period at the end of which they will conclude recovery in equity. And it is said that courts of equity act not so much in analogy as in obedience to statutes of limitation of legal actions, because, where the legal remedy is barred, the spirit of the statute bars the equitable remedy also. Though, on the equity side of the United States courts, the statute of limitations cannot be pleaded, the court may look to such stat-

ute for analogies in applying the doctrine of laches. But the rule that the statute furnishes an analogy is not inflexible, and its application will always depend upon the particular circumstances of the case. In some of the states there are statutes of limitation applicable to equitable actions, but it is held that the period of limitation of equitable actions fixed by the statute is not, where a purely equitable remedy is invoked, equivalent to a legislative direction that no period short of that time shall be a bar to relief in any case, or preclude the court from denying relief, in accordance with equitable principles, for unreasonable delay, although the full period fixed by the statute has not elapsed since the cause of action accrued." (See, also, cases cited.) In *Delavan* v. *Duncan*, 49 N. Y. 488, the court say: "Under such circumstances the plaintiff had no equitable right to watch and wait during the period of the statute of limitations to avail himself of the benefit of the contract if advantageous to him, but absolved therefrom if otherwise." In *Calhoun* v. *Millard*, 121 N. Y. 69, this question is fully discussed. This case was decided in 1890, and the court, in a unanimous opinion, say: "Courts of equity, it has been said, act not so much in analogy to as in obedience to statutes of limitation of legal actions, because where the legal remedy is barred the spirit of the statute bars the equitable remedy also. In the present case the cause of action for the cancellation of the bonds was not barred by the ten years statute applicable to equitable actions. But a period of nine years had elapsed, after the bonds were issued, before the commencement of the action. But we apprehend that the period of limitation of equitable actions fixed by the statute is not, where a purely equitable remedy is invoked, equivalent to a legislative direction that no period short of that time shall be a bar to relief in any case, or precludes the court from denying relief, in accordance with equitable principles, for unreasonable delay, although the full period of ten years has not elapsed since the cause of action accrued. The ten years' limitation was primarily designed to shield defendants. (*Buffalo etc. R. R. Co.* v. *Dudley*, 14 N. Y. 352.) And it must be true that a court, in the exercise of its equitable jurisdiction, could not entertain or enforce a cause of action barred by the statute, and not within any

exception, acting upon any general equitable considerations. But in enforcing purely equitable remedies, depending upon general equitable principles, unreasonable and inexcusable delay is an element in the plaintiff's case which a court of equity always takes into consideration in exercising its discretion to grant or refuse relief, and is not a mere collateral incident. Where there is a remedy at law whereby the plaintiff can prosecute or defend his legal right, the refusal of relief leaves the parties where they were. If there are special circumstances which may change the situation of the plaintiff to his injury, unless the equitable remedy is interposed, this fact may be considered. But the right of the court to deny relief, upon equitable grounds, for long delay, although short of the statute period of limitation, is in the nature of a defense, and is not, we think, taken away by the statute. There may be a well-founded distinction between the case of an application for an equitable remedy in aid of or to enforce a legal right not barred by the statute, and the case where an exclusively equitable remedy is sought, such as to restrain proceedings at law, or, upon the principle *quia timet,* to deprive an adversary of the muniment of his alleged legal right, which he inequitably retains. In cases of the latter class, long delay or acquiescence, although short of the statute period for the limitation of equitable actions, may be a ground for refusing relief. (Pomeroy's Equity Jurisprudence, § 817.) The cancellation of securities is a purely equitable remedy, and cannot be claimed as an absolute right, nor is it applied for or awarded in aid of a legal right or title. We conclude, therefore, that it was within the power of the court to dismiss the complaint, so far as relief was sought for a cancellation of the bonds, on the ground of delay in bringing the action. The circumstances justified the conclusion on this branch of the case." (See, also, *Reynolds* v. *Sumner*, 126 Ill. 58; 9 Am. St. Rep. 523, and note, with authorities cited therein.)

It may be said that we have the code practice, in which actions of law and equity are merged; that we have but one form of action, either in law or equity. But does it follow, as a consequence, that the principles of equity jurisprudence, so long and everywhere in vogue, are abrogated? Is the rule

that a party seeking the interference of a court of equity in the enforcement of a contract must show himself "ready, desirous, prompt, and eager," which has become a maxim of equity jurisprudence, abrogated by the adoption of the code practice, the merging of law and equity into one tribunal, and providing for but one form of actions in law and equity? Shall it be said in this state that a party shows himself to be sufficiently "ready, desirous, prompt, and eager," provided that, in strictly equitable cases, like the one at bar, he brings his suit within the period prescribed by the statute of limitations? And, if he brings his suit within the statutory period, will it be said that he is not, and cannot be, guilty of such laches as will debar his right to relief in strictly equity cases? New York is a code state. Her courts do not so hold, as will be seen by the cases quoted above. Nor do any of the authorities that we have been able to examine so hold. We do not think the position tenable. (Waterman on Specific Performance, 628; *Hall* v. *Russell*, 3 Saw. 506; Fed. Cas. No. 5943.)

In the consideration of this case we have deemed it unnecessary to treat as important the acts of defendant or the plaintiff occurring prior to the alleged accruing of his right of action, although the record and findings show that he failed to comply therewith in many important respects. We have confined the consideration to the question as to whether the plaintiff was guilty of inexcusable laches in commencing his suit for specific performance after he was ousted from the possession of the real estate in question, and knew that the defendant would not comply with the contract of sale thereof unless compelled so to do. The plaintiff, as the record shows, and as he admits in his testimony, waited for three and a half years after his cause of action accrued, without any excuse, before he instituted this suit. He offers no excuse for this delay. He testifies that he was able at all times to obtain money so to do if he had so desired. During all this unexplained and unexcused delay, the circumstances and conditions of the property were rapidly changing, and increasing in value. Under these facts and circumstances, we think it would be inequitable to decree specific performance of the contract in this case. The judg-

ment of the lower court is therefore reversed, and the cause remanded for new trial.

*Reversed.*

DE WITT, J., concurs.

HARWOOD, J., dissenting.—From reading the prevailing opinion, without acquaintance with the record of this appeal, I should conclude the court had decided a case involving the following conditions: In case an opulent speculator, forehanded, with thousands of dollars in ready cash, should contract to purchase a lot in a townsite, pay one-fourth of the purchase price, and, having partly constructed a building thereon, according to the requirements of the contract, should leave it unfinished, and abandon the premises, without cause or excuse, and fail to pay the taxes thereon for some three years, and then bring an action to enforce specific performance of such contract, he ought to be denied the relief sought. Such is the case, as it seems to me, which is set forth and determined by the foregoing treatment; and the decision, as applied to such a case, would undoubtedly be correct. But to me the record of this appeal discloses quite a different case, and therein will be found the ground of my dissent from the decision of the majority of this court.

Before proceeding to an examination of the record, however, it is well to observe the principles or conditions on which a court of equity would refuse to entertain plaintiff's action, because of delay in presenting his complaint, where the action is brought within the time prescribed by the statute of limitations. This case is decided entirely on the proposition that plaintiff ought to be denied the relief sought—that is, specific performance of the contract for the purchase of said lot—because of laches on his part, as this court holds, in failing to bring his action earlier. His action is not barred by the statute of limitations, although the code of this state prescribes a limitation for such actions. Where statutes of limitations have been enacted, prescribing the periods within which various suits may be brought, courts of equity recognize and shape their practice in conformity thereto, in so far as time only is considered as ground for denying the relief.

The limitation prescribed by statute is based on no equitable ground, but on consideration of public policy, and bars the action, irrespective of equitable considerations. Therefore, in modern equity practice, where such statutes prevail, courts of equity will not, and ought not, refuse relief in an action brought within the period of limitation, simply by an arbitrary holding that the claim or right sought to be enforced is stale, and that the complainant is guilty of laches, merely because he had not come into court earlier with his complaint. It cannot be logically held that a right or demand is stale solely because a certain period of time has elapsed since the right of action arose, if it is still within the statute of limitations. Such holding would be setting up a rule by the court in contradiction of the legislature. The legislature has prescribed the date at which the right or demand will become stale by the lapse of time, and thereby become devitalized of virtue, as it were, in view of the law. If, then, the court arbitrarily fixes a shorter period of limitation, it contradicts and sets at naught the will of the legislature. Therefore, where such statutes prevail, if the doctrine of laches is to be applied as ground for denying relief in an action brought within the statute of limitations, the laches must arise from, and be based upon, conditions, or circumstances which have transpired while plaintiff delayed his action, whereby it would be inequitable to award the relief sought. Such new conditions or circumstances, and not merely the lapse of time, is the ground on which plaintiff is held to be too late in asserting his rights. I apprehend that is the true principle on which courts of equity, in modern practice, where statutes of limitations have been enacted governing all cases, apply the doctrine of laches in certain equitable actions, such as actions for specific performance. (Beach on Modern Equity Jurisprudence, § 568.) There is no doubt that, where such conditions have intervened, courts of equity will deny relief, because the relief sought cannot, with equity, be enforced, although the action is brought within the period of limitation prescribed by statute. The real point involved in this case is whether such conditions have intervened. Therefore, if plaintiff, who has brought his action within the period prescribed by the statute of limita-

tions, is to be denied relief on the ground of laches, such holding ought to be founded on the fact shown,—that, through his fault and his delay in commencing his action, defendant had been misled, or circumstances have so changed as to make it inequitable to award specific performance.   But no such conditions, in my opinion, are shown by the record in this case.

It appears that plaintiff purchased said lot in the latter part of January, 1887, and paid thereon eighty-seven dollars and fifty cents, being one-fourth of the purchase price.   The other installments of the purchase price, of eighty-seven dollars and fifty cents each, were, according to the conditions of the contract, to fall due on the twenty-second day of April, July, and October of that year.   Plaintiff thereupon undertook the erection of a house on said lot, which was required by the terms of the contract to be erected, at a cost of not less than five hundred dollars.   In the course of that undertaking, and to obtain money in aid thereof, plaintiff negotiated a loan of one hundred and twenty-five dollars from a bank in Great Falls; and, to obtain surety for that loan, plaintiff assigned his contract for the purchase of said lot to Mr. Paris Gibson, vice-president of defendant townsite company, for which indemnity Mr. Gibson signed plaintiff's note as surety for said loan. The money thus obtained plaintiff expended in his endeavor to erect said building.   On this point plaintiff testified: "I did not use any part of the one hundred and twenty-five dollars borrowed on the note to make the first payment on the contract.   I bought windows with it and a little lumber; bought five windows of Murphy & Maclay, and the lumber that went into the house I bought partly from the Holter Lumber Company and partly from Mr. Meyers."   When said note fell due, about July of the same year, plaintiff was unable to pay it then, but a few weeks later, having secured the money with which to pay said note, plaintiff went to the bank, found said note there, learned from the banker the full amount due thereon, including interest, and informed the banker that he would return the next day and pay the note. But, on his return to the bank, the next day, plaintiff was informed by the banker that Mr. Gibson had preceded him there, and paid said note, and taken the same, along with the

contract for the purchase of said lot, which contract was assigned to Mr. Gibson, as aforesaid. A few days later plaintiff called on Mr. Gibson, and offered to pay the note with money which he had borrowed for that purpose. But Mr. Gibson said, on that occasion, he did not know whether he would receive the money or not; and plaintiff called a second time, as he states in his testimony, and offered to pay to Mr. Gibson the money due on the said note and contract, but plaintiff was put off by Mr. Gibson saying, "I will see." Plaintiff testifies that he was then ready and willing to pay all money due on said contract and note, and had the ability to pay it. He said he had borrowed the money for that purpose, but the payment was not received by the company, and the transaction remained in that condition, without payment being made or received, until the 22d of October, 1887, when the last installment, according to the terms of said contract, fell due. On that date, as the facts are shown by the testimony and found by the court, and in no manner disputed, plaintiff, having borrowed money sufficient for that purpose, caused to be tendered to defendant townsite company, and to its officers, the full amount due on said contract, but the same was refused. It does not appear from any testimony in the record that this payment was refused on the ground that plaintiff had up to that time failed to complete the house on said premises, nor was any reason assigned by the company for refusing to receive such payment, nor was plaintiff notified of defendant's intention to undertake the forfeiture of plaintiff's rights and interests in said lot, together with his investments therein. Plaintiff was in actual possession of said premises, residing with his family in the house which he had erected thereon, at the expense, up to that time, of three hundred and thirty dollars, as found by the court. The house appears to have been plastered and finished inside, and sided with rough lumber on the outside, so as to be habitable in that season of the year, but it still lacked the finishing siding, corner boards, and painting necessary to complete it, and lacked the expenditure of one hundred and seventy dollars thereon to fulfill the terms of the contract as to the cost of the improvement. On this point, in the course of plaintiff's testimony,

he said: "I moved into the house with my family, consisting of my wife and child, in May, and lived in it until my wife was confined, and able to leave, when I moved back to my ranch, about five miles east of Great Falls, having lived in the house six weeks or two months. After moving out of the house I saw it every week, going back and forth. I had it rented for a while." There is no dispute about the facts set forth above, or, indeed, as to any material facts presented by the record in this case.

It is obvious, from the condition of said house, as shown by the testimony, that in order to save the structure, with what plaintiff had expended thereon, he would be obliged to go on and complete it by supplying the necessary siding. Moreover, the company could have withheld from plaintiff a deed, on his payment of the purchase price, and demanded the immediate completion of said house, with notice that in the event of failure therein the company would proceed according to law to recover the premises, and forfeit plaintiff's investments therein. But the company made no such demand, nor any demand, nor gave any notice whatever, so far as appears from the record in this case. It appears that plaintiff was holding a ranch claim a few miles from Great Falls, and that in the month of September or October of the same year he moved thereto with his family. On this point plaintiff testified: "I lived in the house until September or October, and then moved to the ranch. I may be mistaken as to the length of time. I had a tenant who remained in the house two or three months." After plaintiff removed therefrom, as shown by the testimony and findings, defendant company, through its officers and agents, unlawfully entered therein, and took possession of said house and lot, and caused said house to be finished, by putting the siding and corner boards thereon, at the expenditure of one hundred and twenty-five dollars, and has ever since held said premises, receiving the rents and use thereof, which the court found to be of the value of three hundred and ninety-two dollars and fifty cents. In addition to the expenditure of the one hundred and twenty-five dollars in finishing said house defendant company caused to be built a fence about said lot, which "consisted of posts with one scant-

ling on top," according to the testimony of defendant's witness, who built it. The company also caused five shade trees to be planted upon the lot, the cost of which is not stated. Such fence and shade trees, however, were not required by the contract of sale to plaintiff. Such was the extent of defendant's expenditures on said lot. If it had increased in value to the sum of two thousand dollars such increase was not caused by any thing done in respect thereto by defendant.

Among the delinquencies set down against plaintiff in the statement of the case which precedes the prevailing opinion it is said: " The evidence shows, and the court finds, that the plaintiff failed to pay the taxes thereon before the commencement of this action, amounting to sixty dollars." That might have the appearance of abandonment of said premises, when considered alone. But no such impression emanates from that fact when it is put in its proper relation to the other facts shown in this case. The facts are, as shown by the record, that plaintiff went into possession of the lot early in the year 1887, after the taxes for the preceding year were due and payable by the townsite company, and about the close of the same year, or early in the year 1888, the townsite company unlawfully dispossessed plaintiff, took possession of said lot, with all improvements plaintiff had erected thereon, and has held and enjoyed the use and benefit thereof ever since. Who, then, under such circumstances, should have paid the taxes on said lot? The fact is that the trial court found the issues in this case in favor of plaintiff, and that he was entitled to a specific performance of said contract, but at the same time required plaintiff to do equity in the premises—that is, to pay all that was due on the contract, and reimburse what defendant townsite company had paid out on the premises; and, in so doing, the court found, not that plaintiff had failed to pay the taxes on said premises, amounting to sixty dollars (not as though he was delinquent in that respect), but that the townsite company had paid out that sum in taxes thereon during its unlawful holding of the premises from plaintiff, which sum was credited to the townsite company against the value of the rents and profits with which it was charged, amounting to three hundred and ninety-two dollars and fifty cents.

This court appears to take the position that plaintiff ought to show some excuse for not bringing his action earlier, although it was brought within the period prescribed by the statute of limitations. Plaintiff was questioned on this point, and, in his testimony, gave the court a direct answer, as follows: He said: "There was no reason for not taking steps to compel the company to make a deed, except that I was financially fixed so that I could not. I suppose I could . have borrowed a few hundred dollars on short notice. I was running a ranch. I am . now a roustabout—general work—doing work at day labor. I was getting four dollars per day in the spring of 1887; four dollars and fifty cents per day in 1886; but it was not steady work. I got three dollars and fifty cents per day in 1888. I don't remember what I got in 1889. I was raising crops and holding the ranch down. I do not own the ranch now. I sold it. I had several thousand dollars last fall, and had at all times the ability to get money." I observe that the last remark in the above statement of plaintiff is quoted against him in the prevailing opinion, coupled with the observation that plaintiff's delay "is not explained, or in any way attempted to be explained, or excused. In fact, it seems no excuse for this delay existed." And the same is reiterated in other parts of the opinion. But there is no dispute that plaintiff's financial condition was as he stated until he sold his ranch claim; and his repeated borrowings, in his struggle to fulfill the terms of said contract, and save said lot and his investments therein from forfeiture, corroborate plaintiff's statement as to his scant resources. And, finally, when plaintiff had exhausted his savings and borrowings, the defendant company, without notice, and without demand on plaintiff to complete the fulfillment ot said contract, already so far advanced, and without process of court, unlawfully and forcibly entered said premises, evicted plaintiff, and assumed and held what he had invested therein. Such is the case shown by the record, without dispute. If we sat like schoolmasters, with watch in hand, to question litigants who come into court within the period prescribed by statute as to· the reason why they did not come a little sooner, I think the excuse given by plaintiff, corroborated by all the other facts

shown, is worthy of consideration. But, in my opinion, it is more to the purpose of the law to inquire whether circumstances have so changed while plaintiff delayed his action as to make it inequitable to compel a conveyance. But no such circumstances are shown. It is said in the prevailing opinion, " the circumstances and conditions of the property were rapidly changing, and increasing in value." If we look to the record we find that the only change wrought in the condition or circumstances of the property was that, after unlawfully evicting plaintiff, the defendant townsite company expended on said premises the small sum necessary to finish and avail itself of plaintiff's expenditures thereon; and, in that condition, defendant has ever since held and enjoyed the use and profits thereof. The increase in the value of the premises arose from nothing that defendant did in relation thereto, so far as shown by the record, but from general and remote causes. If the property rose in value from the discovery of mines, for instance, in adjacent country, is that to be regarded as a blessing to which the defendant corporation had a peculiar and superior right? And if defendant had wrongfully and oppressively invaded plaintiff's rights, declared forfeiture, and made eviction, without notice or process of court, and confiscated plaintiff's interests and investments in said property, are such acts to be regarded as justified, beyond rectification, because the property has risen in value through natural and remote causes? Because of such blessing upon the land by nature, would it be inequitable for the court to redress the wrong done to plaintiff, and see that right, fairness, and justice prevail? These questions are not answered by voluminous quotations from decisions founded on an entirely different state of facts. The increase in value may have been the very motive which impelled defendant to such arbitrary and unlawful conduct; at least, it was losing nothing, but gaining much. Notwithstanding such showing of constant increase in value, this court, in shutting the door of the trial court against plaintiff, remarks, "Could the plaintiff lie by, and wait to see whether his contract was a good one"? The record answers that when plaintiff was thrust out of the property he was compelled, by his impoverished condition, to lie by, and see the property which he had so

nearly gained constantly rise in value in the unlawful grasp of defendant, and that increase was without the act of defendant, except the expenditure of a trifling sum to avail itself of plaintiff's investments. There was no lying by to see whether the bargain was a good one, for the record shows that the property was *constantly* increasing in value. By borrowing money, and offering payment of the sums required by the contract when the last installment fell due, plaintiff showed himself willing and eager to carry out the contract. After he was dispossessed, of course, plaintiff could not finish said house, and defendant made the same impossible by causing said house to be finished for its own advantage. This court does not venture to hold, and I apprehend no court would, under the authorities, hold, that time was of the essence of the said contract. Besides, this defendant had no lawful right to undertake to enforce forfeiture and eviction without demand, or notice or process of court. Defendant had power to enforce its contract by lawful means and processes, and this is sufficient for any citizen of this state. The facts, as disclosed by the record, in my opinion, fully warranted the decision of the trial court awarding specific performance.